THOMAS BONACUM, BISHOP, APPELLANT, V. LEWIS J. HARRINGTON, APPELLEE.

FILED OCTOBER 9, 1902.   No. 11,986.

Commissioner's opinion, Department No. 2.

1. **Religious Organization:** GOVERNING AUTHORITY: REVIEW BY COURT. The courts will not review the judgments or acts of the governing authorities of a religious organization with reference to its internal affairs for the purpose of ascertaining their regularity or accordance with the discipline and usages of such organization. *Pounder v. Ashe*, 44 Nebr., 672.

2. **Governing Authority:** ONE MAN: SYNOD: CONFERENCE: PROCEDURE. For the purposes of this rule it can make no difference whether the governing authority is confided to one man or to a synod or conference, nor whether the mode of procedure permitted to such person is in accord with the ordinary course of investigations or trials. Each religious organization must be the judge of its own laws.

3. ————: ————: ————: ————: INJUNCTION. When the governing authority of such an organization has deprived one of its clergymen of his authority to officiate as such, he may be enjoined from making use of church property in that capacity, or under color of the functions of which he has been deprived.

4. **Local Church:** GENERAL ORGANIZATION: GOVERNING AUTHORITY: REVIEW. Where a local church congregation is a member of a general organization having general rules for the government and conduct of all its adherents, congregations and officers, the orders and judgments of the general organization through its governing authority, so far as they relate exclusively to church affairs and church government, are binding on the local associations, and will not be re-examined by the courts. *Pounder v. Ashe, supra.*

5. **Property Contributed to General Church Organization for Religious Purposes.** In case property has been contributed and conveyed to the authorities of the general church organization for the purpose of religious worship in accordance with the doctrine and discipline of a particular denomination, persons claiming under said denomination and not pretending in any

way to hold adversely thereto, or to have any title of their own except as members thereof, may be enjoined from using such property contrary to the determination of the governing authority of the denomination. *Pounder v. Ashe, supra.*

APPEAL from the district court for Harlan county. Heard below before ADAMS, J. *Reversed.*

*Riley L. Keester,* for appellant.

*Webster S. Morlan, A. M. Beresford* and *J. G Thompson, contra.*

POUND, C.

Thomas Bonacum, as bishop of the Roman Catholic Church for the diocese of Lincoln, brought this suit against Lewis J. Harrington to obtain an injunction restraining the latter from exercising the powers or faculties of parish priest in the parish of Orleans in said diocese, in contravention of the action of plaintiff, as such bishop and as the governing authority of the church in said diocese, withdrawing his faculties and depriving him of his authority as such parish priest, and from acting or assuming to act in that capacity, exercising the functions of which he had been deprived, or excluding the regularly appointed priest of said parish from the church property therein, or interfering with him in the exercise of his office. A decree was rendered dismissing the suit, from which the bishop appeals.

The controversy involves the interpretation and application of several paragraphs of the decrees of the third plenary council of Baltimore, shown by the evidence to be an authoritative statement of the rules, customs, canons and discipline of the Catholic church in this country. It appears in evidence that the church distinguishes between priests who belong to and are incorporated in a diocese, and those who are proper to some other diocese, but are in process of acquiring a new situs. With respect to the latter, a further distinction is made between secular

clergy, the ordinary parish priests, and regular clergy, those who are members of religious orders and have taken special vows. Thus much is conceded by all parties. It is also conceded that the bishop may not deprive or dismiss a priest who has become incorporated in his diocese except upon due trial, after notice and opportunity to defend. With respect to priests who have not been incorporated in the diocese, the evidence appears to show that the bishop may not incorporate them in the first instance when they come to him, but must receive them upon probation for a period of three or five years, as he may determine, after which he may incorporate them by formal act, or may allow them to become incorporated by non-action.

In the case of regular clergy who have taken vows, it is provided that the bishop shall not admit them, even to the preliminary probation in the first instance, unless they have already become secular priests before they come to him; but on their producing letters of secularization and after making secret investigation as to the character and qualifications of the priest, he may transmit the result of his investigation to the authorities at Rome, who may finally complete the secularization, whereupon the ordinary process of incorporation will ensue. A written agreement between the bishop and Father Harrington is in evidence, in which it is set forth that the latter is received as a "guest" of the diocese, and that in case the bishop determines to receive him on probation the period thereof shall be five years. It is also agreed that the bishop, for reasons of which he shall be the sole judge, may at any time prior to the expiration of the period of probation refuse to incorporate the defendant, and dismiss him. The bishop contends that under the customs and law of the church in this country there is a recognized practice of receiving priests from other dioceses as guests, without taking them on probation, and without their acquiring any rights to be incorporated until so taken; and he insists that Father · Harrington was received in this capacity only, and that he at no time permitted the latter

60

to enter upon the stipulated five-year period of probation, or to become incorporated. He also claims that the necessary steps toward complete secularization have never been gone through with, and consequently that Father Harrington, as a member of a religious order, was not entitled to be received on probation. On the other hand, Father Harrington asserts that the paragraphs relied upon by the bishop as his authority for receiving clergymen as guests of the diocese, refer to what he calls "borrowed priests" or priests loaned by one bishop to another for a temporary purpose, and have no application to his case. He also insists that by virtue of certain letters of secularization, introduced in evidence, he was eligible to be received on probation and was so received, and produces some written statements of the bishop, which tend to show that he was regarded as on a permanent footing in the diocese. The bishop contends that the letters of secularization produced are merely a necessary preliminary to the procedure provided for full secularization, and points to a paragraph of the church laws which might be so construed. The lower court, construing the several paragraphs of the church law in evidence, seems to have held that Father Harrington, having been in the diocese a little longer than five years, had become presumptively incorporated, and was entitled to the mode of trial provided for incorporated priests, so that the bishop could not dismiss him or refuse to receive him after a secret investigation, as in the case of those who had not acquired a permanent situs.

The laws and decrees of the church in evidence presuppose a considerable knowledge of the canon law, and their interpretation by a court, which has no knowledge and can not take judical notice of that system, must necessarily be very unsatisfactory, in the absence of more complete and explicit expert evidence than is before us in this case. The books in evidence, and the witnesses who testified with regard to them, take many things for granted, of which the court is ignorant, and we should feel greatly embarrassed were it necessary for us to attempt to con-

strue them. Such an endeavor, indeed, would amount to nothing less than making law for the church. In order to reach a sound construction on controverted points, the court should be able to enter into and give effect to the reason and intention of the lawgivers; it must know the general spirit of the organization and its attitude towards its governing authorities,—whether it construes the laws relating to their powers liberally or strictly; and it must consider the construction, if any, which usage and common consent has determined. We have only to turn to the annotations of our public statute books to see that scarcely less law is made by construction and interpretation than by direct legislative enactment. In such a case as this there would be great danger that the ideas of the court would run counter to those of the fathers of the church, and make laws by construction which were never intentionally adopted. We think we are relieved of the duty of so doing under the decision of this court in *Pounder v. Ashe,* 44 Nebr., 673. It is in evidence that the bishop is the governing authority of the Catholic church in his diocese. He is said to be "the supreme pastor, the supreme teacher, the supreme governor." It is his duty, under the laws and discipline of the church, to administer the regulations above mentioned, and, in so doing, necessarily to construe and interpret them. His decision is to be final and conclusive, except as reviewed by his ecclesiastical superiors at Rome. Under such circumstances, we do not think we ought to attempt to review his decision, or put ourselves in his place and determine for the church the meaning of its rules and canons. In *Pounder v. Ashe, supra,* it was settled, after elaborate review of the authorities, that courts will not review judgments or acts of the governing authorities of a religious organization with reference to its internal affairs, for the purpose of ascertaining their regularity or accordance with the discipline and usages of such organization. This case and that are very much alike. In *Pounder v. Ashe* the controversy related to the action of a conference, which was the govern-

ing authority of a religious organization in this jurisdiction, depriving a clergyman of his office and dismissing him; and the question presented was which of two distinct sections of the book of discipline of said organization was to be applied to his case. The conference proceeded under one section, and he claimed its action was irregular, because it should have proceeded under the other. At the first hearing this court reviewed the action of the conference, determined that it proceeded under the wrong section, and rendered judgment accordingly. *Pounder v. Ashe,* 36 Nebr., 564. But upon rehearing the court altered its position, refused to review the action of the superior church authorities, and granted an injunction against the deprived clergyman. *Pounder v. Ashe,* 44 Nebr., 672. In this case the questions are whether the provisions relating to the incorporation of secular priests, or instead those relating to members of religious orders, were proper to be applied, and what character and effect belonged to the letter of secularization produced by the defendant. The construction of the provision by virtue whereof the bishop claims the right to receive priests as guests of the diocese is also in issue. It is manifest that these questions are of exactly the same nature, in their substance, as those before the court in *Pounder v. Ashe.*

For the purpose of the rule announced in *Pounder v. Ashe,* we think it can make no difference whether the governing authority of a religious denomination is confided to one man or to a synod or conference, nor whether the mode of procedure permitted to such person is in accord with the ordinary course of investigations or trials among laymen. Each religious organization must determine its own polity, and be the judge of its own laws. While Anglo-Saxon notions of fair play may lead us to look with disfavor upon secret investigations and summary determinations by one person, we must not forget that contentious methods of investigation are largely English, and that the Roman system, from which the Roman church has derived its procedure, has always been

and still is to a large degree inquisitorial. However much we may think that open and public proceedings and hearings upon due notice ought to be had in every investigation of every sort of charge or issue, we must remember that it is not our province to impose our views as to such matters upon religious denominations. We must not forget that ideas and methods which may seem strange to us are often older than those which, from familiarity, we are prone to think part of the order of nature, and that large bodies of men have been governed by them, and are still governed by them, in the internal affairs of the Roman church, without questioning their entire propriety. When the governing authority of a religious denomination has deprived one of its clergymen of his authority to officiate as such, he may be enjoined from making use of church property in that capacity, or under color of the functions of which he has been deprived. *Pounder v. Ashe,* 44 Nebr., 672. No other remedy is adequate or practicable in such a case. The denomination at large, of which the local congregation forms a part, has generally contributed, and did contribute in this instance, a large portion of the funds and property wherewith the local society is maintained. If the property and the proceeds of such funds may be diverted from the purpose for which they were contributed and administered in contravention of the discipline, doctrines and canons of the denomination, it is obvious that a wrong is perpetrated not without an analogy to a breach of trust. After the decision of this court in *Pounder v. Ashe* the question is not an open one. The remedy of the deprived clergyman is to be found within the organization itself. So long as the judgment or act of his superiors and of the governing authority of the church relates merely to its internal affairs and to church discipline, and he is not deprived or sought to be deprived of any property rights, he has no standing in court to procure a review of the proceedings dismissing him. In *Pounder v. Ashe* the court said: "Mr. Ashe as a member, and also a minister, and from all the evidence, a bright and active one, must be pre-

sumed to have been fully acquainted with the discipline and rules and regulations, and the right of the association to try him in the manner it did, if charges were preferred against him, including that of the duty of the committee to adjudicate the question of under which section and paragraph of the rules the charges must be heard and determined, and when he joined the church and entered its ministry, having assented to them, and, having thus selected and agreed to the tribunal and its powers and jurisdiction, in so far as it affects him alone and his rights to exercise his office as minister and as a member of the association, the civil courts can not and will not examine the proceedings of the trial committee provided by the discipline, to ascertain whether it has in all things acted in accordance with the rules of the church, or construe the disciplinary laws of the association and take upon them the work of a review or retrial of the case and render in it such verdict or judgment as from the court's construction of the laws of the church, should have been announced." These remarks are very pertinent to the case at bar. It may be Father Harrington's misfortune that under the discipline of the society of which he has voluntarily become a member he was subject, under certain contingencies, to be dismissed upon secret investigation, and for reasons of which the bishop was the sole judge. It may be his misfortune that he has devoted his concededly great abilities to the work of a society in which the supreme authority in each diocese is so largely delegated to one man. But having identified himself with such a denomination, his remedy is either to appeal to the proper ecclesiastical superior of the bishop, or, if so advised, to sever his connection with the organization. It is true, he claims to have appealed. But he produces no evidence thereof, and in fact refuses to state how he appealed, or in what manner proceedings by way of appeal are pending. And, even if he had established an appeal, he has introduced nothing to show that the effect thereof would be to supersede the action of the bishop.

Certain members of the local congregation formed a corporation under the general provisions of the statute with reference to religious societies, and intervened claiming rights in the church property in controversy. No relief was granted by the decree, and we do not think it necessary to direct any decree with reference to the petition of intervention. Where a local church congregation is a member of a general organization, having rules for the government and conduct of all its adherents, congregations and officers, the judgments of the general organization, through its governing authority, so long as they relate exclusively to church affairs and church cases, are binding upon such local organizations, and will not be re-examined by the courts. *Pounder v. Ashe, supra.* In this case the property has been conveyed to the bishop, as representative of the general church organization, and was contributed and was so conveyed for the purposes of religious worship in accordance with the doctrine and discipline of the Roman Catholic Church. Persons claiming under said denomination and not pretending in any way to hold adversely thereto, or have any title of their own, except as members thereof, may be enjoined from using such property contrary to the determination of the governing authority of the church. This proposition likewise is settled in *Pounder v. Ashe.* In that case rival parties of a congregation claimed to represent the true doctrine and discipline of the church, and the one attempted to exclude the other from such property, and to administer it contrary to the determination of the conference. The court granted an injunction, as we think properly, because the question was not one of title or possession, but purely one of the administration of trust property in accordance with the terms of the trust. The bishop has prayed for no injunction against the interveners, and they have obtained no relief against him. If they claim merely as members of the local congregation and in subordination to and under the church, it is obvious that they are bound by his determination, or the determination of his ecclesiastical su-

periors. If they claim by some independent title, or claim adversely to the church, or to the trust represented by the bishop as its governing authority in this jurisdiction, the bishop's remedy would be by forcible entry or ejectment.

In conformity with the rules established by this court in *Pounder v. Ashe*, we recommend that the decree of the district court be reversed and the cause remanded with directions to enter a decree enjoining and restraining the defendant, Harrington, from exercising the powers or faculties of parish priest in or upon the property of said parish of Orleans in contravention of the orders of the bishop, and from exercising therein the functions of which he has been deprived by the bishop, or excluding such person as the bishop shall appoint regularly as priest of said parish from the church property in the petition described, or interfering with him in the exercise of his office. Further than that we do not think an injunction ought to run. Any contests over possession under claim of title, as distinguished from the administration of the church property in accordance with its discipline, laws and canons, must be decided in proper proceedings at law.

BARNES and OLDHAM, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed and the cause is remanded with directions to enter a judgment enjoining and restraining the defendant, Harrington, from exercising the powers or faculties of parish priest in or upon the property of said parish of Orleans, in contravention of the orders of the bishop, exercising therein the functions of which he has been deprived by the bishop, or excluding such person as the bishop shall appoint regularly as priest of said parish from the church property in the petition described, or interfering with him in the exercise of his office.

REVERSED AND REMANDED.

NOTE.—*Civil Courts.—Ecclesiastical Cases.—Church Authorities.*—The only ground upon which civil courts interfere in ecclesiastical cases

being the protection of civil rights, they will not interfere with the exercise of any discretion on the part of the church authorities and will not revise or correct the proceedings of ecclesiastical tribunals. *Walker v. Wainwright*, 16 Barb. [N. Y.], 486.

The jurisdiction of ecclesiastical tribunals being conclusive as to ecclesiastical offenses, as well as upon doubtful and technical questions involving a criticism of the canons of a church, the civil courts will not revise the decision of such tribunals for the purpose of ascertaining or defining this jurisdiction, nor will they revise or question their construction and interpretation of the canons of the church. *Chase v. Cheney*, 58 Ill., 509.

The foregoing authorities are cited by High, Injunctions [3d ed.], secs. 309 and 310. There is an apparent contradiction between the sections. The first would seem to say that a civil court may inquire into the jurisdiction of the ecclesiastical tribunal under the law of the church, and there is a *dictum* to that effect in *Walker v. Wainwright, supra;* but this is clearly not the law, and is not so held to be in either of the cases cited by High. If it is a question of canon law, and the church tribunal even *claims* jurisdiction, it is a question to be determined *intra ecclesiam*, and not in a civil court.—W. F. B.

This note was prepared by the editor at the suggestion of the author of the opinion.