Thomas   Bonacum,   Bishop,   appellant,   v.   William
Murphy, appellee.*

Filed March 17, 1904.  No.' 13,390.

1. **Ecclesiastical Tribunals:** Civil Courts: Review. The courts will
not review the judgments or acts of the governing authorities of
a religious organization with reference to its internal affairs, for
the purpose of ascertaining their regularity or accordance with the
discipline and usages of such organization, but they will inquire
and determine whether or not a church tribunal, which under-
takes to expel a member, has been organized in conformity with
the constitution of the church, and whether a member of such
tribunal is disqualified under the rules and canons of the church
from sitting as a judge in the case. These questions are not
ecclesiastical and within the exclusive jurisdiction of the eccle-
siastical tribunal, although the decisions of such tribunal, if prop-
erly and legally constituted, would be binding on the civil courts
on all matters properly before it for trial.

2. ———: Appeal: Enforcing Sentence: · Injunction. Where a
church tribunal of original jurisdiction proceeds to try and dis-
cipline or expel a member of the society, and the member pro-
ceeded against claims that the presiding judge is disqualified
from acting on account of a challenge interposed before the com-
mencement of the trial, and where such challenge has been dis-
regarded and an appeal has been taken by the accused to an
appellate church tribunal, the civil courts have jurisdiction to
enjoin the enforcement of a sentence pronounced against the ac-
cused until the appellate ecclesiastical tribunal has disposed of
the appeal.

3. **Appeal:** Injunction. Where the district court has enjoined the
enforcement of a decree of an ecclesiastical court or the prosecu-
tion of any civil action against the accused, until an appeal taken
by him has been determined by the appellate ecclesiastical court,
it is immaterial whether such appeal is suspensive or devolutive,
as the injunction must be observed and obeyed until the appeal
has been disposed of.

4. **Evidence:** Review. Evidence examined, and *held* to warrant the
finding of the trial court that an appeal taken by the defendant.
had not been determined or disposed of.


Appeal from the district court for Seward county:
Samuel H. Sornborger, Judge.  *Affirmed.*

* Rehearing allowed.  See opinion, p. 487, *post.*

*C. E. Holland* and *Roscoe Pound,* for appellant.

*M. D. Carey* and *Norval Brothers, contra.*

DUFFIE, C.

The appellant, as bishop of the Roman Catholic church in the diocese of Lincoln, brought this action against the appellee, a priest of the mission of Seward in said diocese, to enforce the decretal order of the curia, the ecclesiastical court of the diocese, against the appellee for alleged wilful and continued disregard and violation of the canons, rules, regulations and discipline of said church, and for wilful disobedience to his superiors. For convenience the parties will be designated as in the court below, plaintiff and defendant.

The plaintiff's petition is in two counts, and sets out his cause of complaint in detail and at great length. The material allegations are, however, the following: After alleging that he is bishop of the diocese of Lincoln, which comprises that part of the state of Nebraska south of the Platte river, it is stated that the mission of Seward comprises certain real estate upon which is located a church and parsonage and also certain real estate and the church building thereon at Ulysses. In 1897 the defendant was appointed to this mission and took up his abode in the parsonage at Seward; that by virtue of the laws, canons, statutes, discipline, rules and regulations of the Roman Catholic church, the plaintiff is invested with the power and authority to transfer at his pleasure any priest, pastor or rector from any parish or mission within the diocese of Lincoln as an administrative act, and also, if required by the nature of the case, by a judicial act; that in the exercise of his prerogative he suspended and transferred the defendant from the mission of Seward on May 5, 1900, and thereafter appointed as rector or priest of said mission the Reverend John A. Hays; and that on April 5, 1900, in the exercise of his authority he trans-

Bonacum v. Murphy.

ferred the defendant from the mission of Seward to that
of Red Cloud, in Webster county, Nebraska; that it was
the duty of the defendant under the rules and regulations
of the church to immediately comply with such sentence
of transfer upon the same being known to him, but that
he failed and refused, and still refuses, to vacate and sur-
render to the plaintiff possession of the church and church
furniture and fixtures, sacred vessels, vestments, and
other church property belonging to the church in said
mission of Seward.  It is further alleged that on July 14,
1900, the plaintiff commenced an action in the district
court for Seward county, reciting in his petition the
foregoing facts and asking, among other things, that the
defendant be restrained and enjoined from entering into
either of said church edifices in said mission of Seward,
and from exercising any of the rights of a priest or rector
in said mission, and from collecting the revenues of said
church in said mission and from hindering or in any
manner interfering or preventing the Reverend John A.
Hays from performing his duties as a priest or rector in
said mission; that after a partial hearing in said cause
and before the case was submitted to the court, the plain-
tiff dismissed that action without prejudice, but that,
notwithstanding said dismissal, the court proceeded,
wholly without jurisdiction, to render judgment in said
cause; and it appearing to the satisfaction of the court
that the defendant had appealed from the sentence and
order of transfer and suspension made by the plaintiff on
the 5th of April, 1900, and that no final decision had been
made, or at least had not been promulgated on said appeal,
the court, on the 6th day of January, 1902, acting wholly
without jurisdiction, ordered and decreed that the plain-
tiff be enjoined from further proceeding in the civil courts
until the defendant's appeal had been heard and deter-
mined by an ecclesiastical court having power and juris-
diction to hear and determine the same; and it is alleged
that said appeal had been heard and determined by the
sacred congregation of propaganda at Rome, the highest
33

court of the Roman Catholic church and the tribunal having power and appellate jurisdiction to determine the matter. The second count of the petition alleges that on January 23, 1901, the plaintiff, in the further exercise of his prerogative, excommunicated the defendant and expelled him from the jurisdiction of the diocese of Lincoln for misdemeanors committed and gross insubordination, which acts and misdemeanors are in violation of the laws, canons, statutes, discipline and regulations of the church; that notice thereof had been communicated to the defendant, and since that time defendant has had no right or authority to act or officiate as a priest or rector of the mission of Seward in any capacity whatever, or to hold possession of the church edifices, the sacred vessels, vestments, furniture and fixtures belonging thereto; that, notwithstanding this, the defendant, in defiance of the laws, canons and discipline of the church, has usurped the rights of said mission and of the priest and rector thereof, and forcibly intruded into each of the church edifices belonging to the mission, and assumed to exercise all the functions of a priest, and forcibly and wrongfully excluded from said churches and rectory the Reverend John A. Hays, and prevented him from officiating as priest of said mission; that he is collecting the revenues of said church; that plaintiff has exhausted all the resources known to the ecclesiastical law and is powerless to prevent the further unlawful acts of the defendant save in a court of equity; and he therefore prays that the defendant be restrained and enjoined by an order of the court from entering into any of the said church edifices or the rectory in said mission, or from exercising any of the rights and privileges of a priest therein, and from officiating or assuming to act as a priest or rector of the church in said mission of Seward, and from hindering or interfering with or in any manner preventing the Reverend John A. Hays from performing his duties as priest or rector of said churches in said mission.

The defendant in his answer admits that plaintiff is

bishop of the diocese of Lincoln; that the mission of
Seward is in said diocese and comprises the parsonage
and churches in Seward and Ulysses; that defendant took
possession of the mission in 1897, and has ever since and
does now reside in the parsonage at Seward; that since
his appointment he has held possession of the mission and
performed the duties of minister therein; he denies that
the laws of the church have clothed a bishop with power
at all times to remove a pastor from one mission to an-
other in his diocese, and avers that under the laws of the
church a pastor can not be removed against his will, ex-
cept by a fair and impartial trial; he alleges that the
plaintiff gave him notice to appear at Lincoln, Nebraska,
on the 20th of March, 1900, to answer to charges pre-
ferred against him; that he appeared on that date and,
before issues were joined, objected and challenged the
right of the bishop to sit in judgment in the case, for the
reason, among others, that the bishop was his enemy and
prejudiced against him, and that within ten days there-
after he sent his objection, challenge and appeal to the
highest church court, and that said objection, challenge
and appeal have never been adjudicated by that court;
he admits that again in October, 1900, he was summoned
before the bishop in the second case, but he repeated the
same objection, challenge and appeal, and immediately
sent the same to the highest court of the church, and that
the same has never been adjudicated by that court. In
a supplemental answer filed by the defendant it is alleged
that on January 6, 1902, the district court for Seward
county rendered a judgment against the plaintiff in an
action between plaintiff and defendant, which action was
founded on the first ecclesiastical judgment mentioned and
described in the petition in this action; that the judgment,
among other things, enjoins plaintiff from commencing
any other civil action involving the same controversy, until
the defendant's appeal taken from the bishop's judgment
has been determined by the highest ecclesiastical tribunal
of the Roman Catholic church having power and jurisdic-

tion to hear and determine the matter complained of, and until the same is determined by the highest judicature of the Roman Catholic church. The defendant's answer is made a cross-bill, and affirmative relief is sought by way of an injunctional order against the plaintiff from in any manner or way interfering or intermeddling with the defendant as priest or rector of the church in the mission of Seward, until the challenges, protests and appeals of the defendant now pending and undetermined in the highest church court of the Roman Catholic church are finally heard and settled by said court.

The plaintiff's reply alleges that the decree and judgment of January 6, 1902, is null and void, for the reason that, before said cause was submitted to the district court, the plaintiff had dismissed his action and the court had no jurisdiction to proceed and enter judgment against the plaintiff. It is alleged that the defendant did not in that action file any cross-petition or set up any counter-claim or set-off that would entitle him to affirmative relief or give the court jurisdiction to proceed after the dismissal of plaintiff's case, and that said order was not made to enforce any ecclesiastical decision; it is further averred that the district court for Seward county had no jurisdiction to restrain the plaintiff as bishop from exercising his ecclesiastical rights in the government of his diocese in relation to the discipline of priests therein or the discharge of their ecclesiastical duties in the several parishes of that diocese; it is further alleged that the defendant has been lawfully convicted and sentenced to removal, suspension, excommunication and expulsion from the Roman Catholic church by an ecclesiastical tribunal of that church having power and jurisdiction to hear and determine the matter, and that such conviction and sentence, and each of them, have been finally determined by the highest judicial judicature of the church. On the final hearing, the court found all the issues against the plaintiff and in favor of the defendant, and entered a decree dismissing the plaintiff's petition.

The decree of January 6, 1902, entered in the prior action between these same parties, contains the following provision:

"It is further considered and decreed by the court that the plaintiff be and he hereby is enjoined and restrained from in any way or manner whatsoever interfering with or meddling with the defendant William Murphy as priest or rector of the Roman Catholic church within the plaintiff's Nebraska mission comprising the parishes of Seward, Nebraska, and Uylsses, Nebraska, and the said plaintiff is further enjoined and restrained from in any way or manner whatsoever commencing or prosecuting any suit or other proceeding in the civil courts on the matters complained of in his petition, until the defendant shall have been duly and lawfully convicted and sentenced by an ecclesiastical tribunal of said Roman Catholic church having power and jurisdiction to hear and determine the matters complained of, and until the same is determined by the highest judicial judicature of said Roman Catholic church."

It is claimed that the decree entered in that case, in so far as it afforded the defendant affirmative relief, is void, because of want of jurisdiction in the court to enter it. We have carefully examined the defendant's answer in that case and, while there is nothing therein denominated a "cross-bill," there are many allegations upon which affirmative relief to the defendant could properly be founded, and the defendant's prayer, based upon these allegations, asked the relief granted by the decree. That the court ought not to interfere with the regular exercise of his ecclesiastical duties by the bishop is too well established to need discussion, and if the decree be construed to enjoin the bishop from proceeding against the defendant in matters of church discipline, and in accord with the rules of the church, then, while we can not say that it would be absolutely void in that respect, it would be so irregular that effect ought not to be given it, unless its terms are so plain as to avoid any other construction. But that the

court had ample jurisdiction, under the circumstances, to enjoin the bishop from instituting and. prosecuting further civil actions until defendant's appeal had been determined can not be doubted; and whether the decree was warranted by the evidence, or is one which should not have been made, is not a question now open to argument.

A somewhat analogous question was before the court in *State v. Baldwin,* 57 Ia. 266, and it was said:

"If these articles of discipline in any way qualify the right of the trustees to control the use of the house they should have been presented to the court in the injunction proceeding, and insisted upon as a reason why the order entered in that proceeding should not have been made. If they were called to the attention of the court in that proceeding, and notwithstanding the court erroneously ordered the trustees to do what is beyond their power, the order may, upon proper proceedings, be reversed. But the order of the court, even if erroneous, was not void. The court had jurisdiction of the parties and of the subject-matter and its adjudication can not be disregarded with impunity. So long as it remains unreversed it must be obeyed. There would be an end of all subordination and social order, if parties could disregard judicial orders, and when proceeded against for contempt, call in question the correctness of the order itself."

In our opinion the decree, in so far as it restrained the bishop from commencing an action in the civil courts until the defendant's appeal had been determined, was not beyond the power of the court to make, and that order should be enforced.

The two questions of paramount importance are, first, did the ecclesiastical court convened by the plaintiff at Lincoln have, under the circumstances, power or authority to proceed to judgment against the defendant; and, second, if so, have the appeals taken by the defendant been determined by the appellate ecclesiastical court? The law is well settled in this state that civil courts will not review or revise the proceedings or judgment of church

tribunals, constituted by the organic laws of the church
organization, where they involve solely questions of church
discipline or infractions of the laws and ordinances en-
acted by its ruling body for the government of its officers
and members. *Pounder v. Ashe,* 44 Neb. 672; *Bonacum
v. Harrington,* 65 Neb. 831.

In *Pounder v. Ashe,* the rule announced in *Watson v.
Jones,* 13 Wall. (U. S.) 679, relating to the power of the
civil courts to inquire into the authority of an ecclesiasti-
cal tribunal, was followed and adopted. It was there said:

"It may be said here also that no jurisdiction has been
conferred on the tribunal to try the particular case before
it, or that, in its judgment, it exceeds the powers con-
ferred upon it, or that the laws of the church do not au-
thorize the particular form of proceeding adopted, and in
a sense often used in the courts; all of those may be said
to be questions of jurisdiction. But it is easy to see that
if the civil courts are to inquire into all these matters, the
whole subject of the doctrinal theology, the usages and
customs, the written laws and fundamental organization
of every religious denomination may, and must, be ex-
amined into with minuteness and care, for they would
become in almost every case the criteria by which the valid-
ity of the ecclesiastical decree would be determined in the
civil court. This principle would deprive these bodies of
the right of construing their own church laws,   *   *   *
and would in effect transfer to the civil courts, where
property rights were concerned, the decision of all ecclesi-
astical questions."

This doctrine was reaffirmed in *Bonacum v. Harrington,
supra,* and is now too well settled in this state to be ques-
tioned or doubted. Relying on this rule, the plaintiff in-
sists that he being the governing authority of the diocese
of Lincoln, his action in relation to the trial of priests and
the enforcement of the rules and regulations of the church
can not be questioned by the civil courts; that he has
exclusive original jurisdiction in such matters, and that
relief can be obtained only by an appeal to a higher

ecclesiastical body. When Father Murphy was called to answer before the curia or church court at Lincoln, he interposed a challenge to the plaintiff as the judge of said court, upon the ground. among others, that he was prejudiced against him and a bitter personal enemy. Defendant asserts that, when a challenge of this character is interposed, the matter of the qualification of the judge objected to must be submitted to arbiters, one to be chosen by the judge, one by the defendant, and, if they can not agree, a third is to be selected by them. In support of this contention he introduced a translation from the decretals of Pope Gregory IX, Book 2, title 28, chapter 31, as follows:

"Challenged judge must appoint arbiters upon whose determination of sufficiency depends whether he can act. You ask to be instructed, when one refuses a judge as suspected, whether he must allege the cause for suspicion, and whether he is bound to prove it unless it is manifest. Also whether the judge can proceed in the business, if he who made the objection of suspicion does not wish or can not prove cause in court. To your consultation we answer that, when anyone proposes that he has a judge who is suspected he allege the cause of suspicion before the same judge; but the parties should be compelled by the judge to agree on some persons not very distant; before whom if the case of suspicion is not proved within a suitable time, and not till then, shall the judge make use of his authority. But if the cause of suspicion is sustained by them, the judge objected to is bound to refrain from taking cognizance of the cause."

Defendant also introduced in evidence the decretals of Pope Gregory IX, Book 2, title 28, chapter 61, as follows:

"Challenged Judge,—continued: Because by a special care has it been provided for that no one may presume to promulgate against anyone a sentence of excommunication, unless a suitable admonition be previously given; wishing also to so provide that the party thus admonished may not under the pretext of a frustrating appeal be able

Bonacum v. Murphy.

to evade the trial of him who gave the admonition: We enact that if he alleges that he has a judge who is suspected he shall assign in the presence of the same the cause of suspicion; and he together with his adversary (or if it happens that he have no adversary), then with the judge, shall together elect arbiters; or if they can not come to an agreement without malice, this shall elect one, and that the other, to take cognizance of the reason for suspicion; and if they can not come to an understanding they shall call in a third, in order that what two of them shall decree may have the strength of durability; and let them understand that they are bound to adhere faithfully to it by an order from us in virtue of obedience under a severe command. If the legitimate reason for the suspicion is not proved before them within suitable period of time, the judge may use his jurisdiction. But if it is legitimately proved, with the consent of him who alleged the reason of suspicion, the judge who is objected to must commit the affair to a suitable person or transfer it to a superior, in order that proceedings should go on in the manner prescribed."

This challenge interposed by the defendant raised not simply a question of the jurisdiction of the court to try the case, but of the disqualification of the judge presiding in the court. A court may have ample or even exclusive jurisdiction to try a case, and yet the judge presiding may, on account of bias or partiality or interest in the case or of his kinship to one of the parties, be disqualified to sit in the case. Such is the case in our probate courts. They have exclusive jurisdiction in probate matters, and yet the probate judge can not act in those cases where the statute disqualifies him. The question here for our determination is not whether the curia at Lincoln had jurisdiction, but whether the judge presiding therein was disqualified from trying this particular case. For the plaintiff it is contended that the decretal orders above quoted are not in force in the United States and are not applicable to the particular proceeding had against the defendant. A re-

view of the several authorities, church rules and decretal orders offered in evidence would unduly extend this opinion. It is sufficient to say that we are not satisfied that plaintiff's contention is upheld by the evidence and are entirely satisfied with the holding of the district court, the more so from the fact that the first idea in the administration of justice is that a judge must necessarily be free from all bias and partiality, and it would be a reflection upon the church to which both parties owe their allegiance, if it could be asserted and maintained that one put upon trial could not show the disqualification of the judge before whom he was cited to appear, but was compelled to submit his case to an interested party, or one so embittered against him that a fair trial could not be hoped for or expected. It is the rule of the civil courts that a judgment entered by a judge disqualified to act in the case is absolutely void. *Walters v. Wiley*, 1 Neb. (Unof.) 235, and cases cited. And if the canons of the church are to be regarded as the rules or statutes controlling the proceedings of the ecclesiastical courts, then, on principle, the same rule should apply to a sentence pronounced by an ecclesiastical judge disqualified from sitting in the case.

If we properly understand the record before us, it is claimed by the plaintiff that, in the proceedings, or at least one of the proceedings, had against Father Murphy, he was acting as a "judge delegate," and that a challenge or objection to a judge delegate does not oust him of authority to try the case. Referring to this phase of the case, we have to say that there is no allegation in the petition that in either of the proceedings brought against Father Murphy in the church curia at Lincoln the bishop was acting as a judge delegate, and a careful examination of the evidence fails to disclose any license or commission from any of his superiors vesting him with that authority. Both of the decrees made by the curia at Lincoln against the defendant are signed "Thomas Bonacum, Bishop of Lincoln, Judge Ordinary," and as we read the record of the proceedings had in those cases it was not claimed that

the plaintiff was acting as a judge delegate in either case. Indeed the record in the second proceeding seems to contradict that claim, as the following quotation taken therefrom will show:

"Before rendering a decision in the case of the *Diocese of Lincoln v. Rev. William Murphy* now before this curia, we deem it proper first of all to pass upon the exceptions and the alleged appeals which the Rev. Murphy claims to have made, and by which he pretends that this curia is deprived of all jurisdiction over him. (See Exhibits F and K.) In his answer to the citation of December 10, 1900, he says: 'I beg to inform you again that in all the matters referred to, you have lost all jurisdiction by my appeal and challenge of March 20 (1900) and by my appeal of October 1, 1900.' As regards the alleged challenge of March 20, 1900, we have to say—as the record of the curia will also show—that no challenge was made on March 20, 1900. If any challenges have been made since that time they are to be regarded as irregular and invalid, inasmuch as they set forth no reasons why the challenge is made. Where a judge *delegate* is challenged it is not necessary to give any reasons for the challenge; but where a judge *ordinary* is challenged it is necessary to set forth the reasons in writing, otherwise the challenge may be disregarded with impunity. (See De Angelis De Recusationibus, L. II, Tit. XXVIII; Smith's Elements II, No. 1038.)"

A consideration of these matters makes it apparent to us that the bishop in the proceedings referred to was acting as judge ordinary and not as judge delegate, and has so represented and designated himself by the record of his own court.

The court did not intend by the language used in *Watson v. Jones, supra,* to establish a rule depriving a member of a church society of a right to resort to the courts in cases where those pretending to act for the society have absolutely no right, authority or power. This is well illustrated by the holding in a later case, *Bouldin v. Alexander,* 15 Wall. (U. S.) 131. It is there said:

"This is not a question of membership of the church, nor of the rights of members as such. It may be conceded that we have no power to revise or question ordinary acts of church discipline, or of excision from membership. We have only to do with rights of property. As was said in *Shannon v. Frost*, 3 B. Mon. (Ky.) 253, we can not decide who ought to be members of the church, nor whether the excommunicated have been regularly or irregularly cut off. We must take the fact of excommunication as conclusive proof that the persons exscinded are not members. But we may inquire whether the resolution of expulsion was the act of the church, or of persons who were not the church, and who consequently had no right to excommunicate others. And, thus inquiring, we hold that the action of the small minority, on the 7th and 10th of June, 1867, by which the old trustees were attempted to be removed, and by which a large number of the church members were attempted to be exscinded, was not the action of the church, and that it was wholly inoperative. In a congregational church, the majority, if they adhere to the organization and to the doctrines, represent the church. An expulsion of the majority by a minority is a void act."

*Hatfield v. De Long*, 15 Ind. 207, 51 L. R. A. 751, is a good illustration of the rule that the civil courts will interfere to prevent a trial by an ecclesiastical court, the members of which are disqualified to sit in the case. The petition in that case alleged the following facts: The appellant was, on a trial had, expelled from the society. He took an appeal to the quarterly conference. The organic law of the society authorizes an appeal to the quarterly conference but no higher. It provides that on appeal the trial shall be had before a tribunal of five, two to be chosen by the accused, two by the quarterly conference, and a fifth by the four: That no person shall sit as a member of the appellate tribunal who sat in judgment at the original trial: That a decision of a majority of the appellate tribunal shall be final, and that any member who refuses to abide by such decision shall be expelled without

further trial.   Appellees constitute the quarterly confer-
ence.   Appellant chose two competent persons to act as
members of the appellate tribunal.   Appellees, with the
fraudulent purpose of depriving appellant of the benefits
of his appeal, selected two of their number to act as
members of the appellate tribunal who had sat in judg-
ment at the original trial.   These two refused to consider
the selection of anyone as the fifth member of the ap-
pellate tribunal except a certain person who is in the
conspiracy to deprive appellant of the benefits of an
appeal, and whose purpose is to join the other two in
denying appellant a fair hearing.   A demurrer to this
petition was sustained by the trial court, but this hold-
ing was reversed on appeal; the court, after stating and
recognizing the general doctrine that the civil courts will
not interfere to review the decision of an ecclesiastical
court, gave the following reasons for reversing the trial
court:

"The foregoing considerations, however, do not dispose
of this appeal.   The cases that have been spoken of pre-
supposed the existence of an ecclesiastical judicatory in
accordance with the organic law of the church.   The mem-
ber, by joining, agrees that the church shall be the ex-
clusive judge of his right to continue.   For the purpose
of trying a member on charges of having violated the
rules of the church or the laws of God, the church is the
tribunal created by the organic law.   The member has
consented that, for all spiritual offenses, he will abide
the judgment of the highest tribunal organized under the
constitution of the church.   But he has not consented to
submit to usurpation.   As Mr. Justice McCabe said in
*Smith v. Pedigo*, 145 Ind. 361, 407, 32 L. R. A. 838, 843:
'It must be the act of the church, and not the act of
persons who are not the church.'   In this case, it
is disclosed that appellant has proceeded as far as
he can within the church.   He was compelled either
to submit his appeal to a tribunal organized in de-
fiance of the constitution of the church, or to appeal

to the secular courts. If the secular courts are without jurisdiction to grant relief, it is apparent that, on the facts alleged in the complaint, the question of appellant's guilt or innocence of a spiritual offense will be determined by an unconstitutional tribunal. This court will have nothing to do with the charge of a spiritual offense. That is an ecclesiastical question purely. But the inquiry, whether or not the tribunal has been organized in conformity with the constitution of the church, is not ecclesiastical. It is the same question, and that only, that may arise with respect to any voluntary association such as fraternal orders and social clubs. The assertion of jurisdiction in such a case is not an interference with the control of the society over its own members; but, on the contrary, it assumes that the constitution was intended to be mutually binding upon all, and it protects the society in fact by recalling it to a recognition of its own organic law."

In the celebrated case of *Chase v. Chency,* 58 Ill. 509, some question was made as to the constitution of the court by which the appellant was tried. In the opinion delivered by Mr. Justice Thornton, language was used indicating that the civil courts would not inquire into the legality of the organization of the ecclesiastical court. Chief Justice Lawrence and Mr. Justice Sheldon, while fully concurring in the conclusion reached, filed a separate opinion, giving their views upon that question. They say:

"We understand the opinion as implying, that in the administration of ecclesiastical discipline, and where there is no other right of property involved than the loss of the clerical office or salary, as an incident to such discipline, a spiritual court is the exclusive judge of its own jurisdiction, under the laws or canons of the religious association to which it belongs, and its decision of that question is binding upon secular courts. This is a principle of so grave a character, that, believing it to be erroneous, we are constrained to express our dissent upon

the record.  We concede, that when a spiritual court has once been organized, in conformity with the rules of the denomination of which it forms a part, and when it has jurisdiction of the parties and the subject matter, its subsequent action in the administration of spiritual discipline will not be revised by the secular courts.  The simple reason is, that the association is purely voluntary, and when a person joins it he consents, that for all spiritual offenses, he will be tried by a tribunal organized in conformity with the laws of the society.  But he has not consented that he will be tried by one not so organized, and when a clergyman is in danger of being degraded from his office, and losing his salary and means of livelihood by the action of a spiritual court, unlawfully constituted, we are very clearly of opinion he may come to the secular courts for protection.  It would be the duty of such courts to examine the question of jurisdiction, without regard to the decision of the spiritual court itself, and if they find such tribunal has been organized in defiance of the laws of the association, and is exercising a merely usurped and arbitrary power, they should furnish such protection as the laws of the land will give. We consider this position clearly sustainable, upon principle and authority."

On the first hearing in *Pounder v. Ashe,* 36 Neb. 564, it was held that this court would inquire whether or not the organic rules and forms of proceeding prescribed by the ecclesiastical body have been followed.  In other words, whether a court properly constituted and having jurisdiction of the matter before it had proceeded in a regular manner with the trial.  On the rehearing it was held that, after the highest ecclesiastical court had determined that the court of original jurisdiction had proceeded regularly and had affirmed its finding, this court would not review such holding.  It will be noticed however that in that case the highest court known to the church society to which Ashe belonged had affirmed the proceedings of the trial court, while in the case at bar

the appeal taken by Father Murphy from the judgment of the curia at Lincoln had not been determined at the time the injunction was issued, and that decree only attempted to stay the hand of the bishop until the appellate ecclesiastical court had passed upon the question.

In *Watson v. Jones, supra,* and in the cases heretofore coming before this court, the opinions have proceeded upon the theory, either that the highest court of the church had settled the question of jurisdiction, or that the court whose judgment it was sought to review had been properly and legally constituted, and that no appeal had been taken from its decision. The rules governing Catholic church trials are much more liberal in behalf of the accused than are those prevailing in the civil courts, it being laid down that the omission of a substantial formality vitiates and annuls the judgment pronounced. In Smith's New Procedure, which both parties cited as authority in Catholic church trials, it is said in article 43, section 2:

"The rule of law is *'quæ contra jus fiunt debent utique pro infectis haberi,'* hence all canonists teach that the omission of a *substantial formality* during the trial vitiates and annuls the entire proceeding. * * * When the trial is null by defect in the proceedings, the sentence passed after such trial will also be null and void and have no effect whatever. For the law prescribes indeed that the guilty shall be punished, but it prescribes also that they shall be punished by the forms of law. These forms are considered by the law the essential means of finding out the truth."

In *Pounder v. Ashe, supra,* this court has adopted the rule that, where the construction of a canon or rule of the church is in controversy, it will accept the construction put thereon by the highest church authority, and that, where the regularity of the proceedings of an inferior ecclesiastical court are passed on by the highest governing authority of the church and the regularity of the proceedings sustained, this court will accept such decision as final and conclusive. And in *Bonacum v. Harrington, supra,* it was

held that the decree of the highest church power in the
state when not appealed from, would also be accepted by
the court as a correct exposition of the question in contro-
versy; but we have never gone so far as to say that we
would enforce the orders of an ecclesiastical court, the
members of which are disqualified from acting, or that we
would accept as conclusive the construction put upon the
canons and rules of the church by an inferior ecclesiastical
tribunal, when that construction was a matter of contro-
versy, and an appeal had been taken therefrom to a higher
ecclesiastical body, and was still a matter for the decision
of the highest governing authorities of the church. The
parties have devoted considerable time to the question
whether, under the rules governing church trials, an appeal
taken from the decrees of the curia at Lincoln would have
the effect of staying the execution of such decrees. A re-
view of the evidence offered by the parties is rendered un-
necessary for the reason that, by the injunctional order of
January 6, 1902, the plaintiff was prohibited from bringing
a civil action against the defendant until the appeal then
taken had been determined by the highest church author-
ity, and this injunction had never in any manner been set
aside or modified.

Before proceeding to examine the evidence relating to
the decision of the appeal taken by Father Murphy from
the order or decree of the bishop, we might premise by
saying that it is the plaintiff's contention that no chal-
lenge was interposed by the defendant to the qualification
of the bishop to sit as a judge in that case, and it is said
that Father Murphy, at the time and before pleading to
the charge against him, desired to read a "statement," and
that he at no time interposed or offered to read a "chal-
lenge." The record shows that when called upon to plead,
Father Murphy asked to read a statement, but this priv-
ilege was denied him, and he was told that he would have
opportunity after entering his plea to the charge to make
such statement as he desired. He then attempted to read
his statement, but was interrupted and great confusion

34

prevailed; he then attempted to file the statement with the secretary of the court, but this was refused under the direction of the plaintiff. This statement, or a copy thereof, is in the record before us, and it plainly contains a challenge setting forth numerous reasons why the plaintiff should not sit in the trial of the case. When the plaintiff says that Father Murphy did not interpose a challenge, that he merely offered a statement, he is making a play upon words, it being evident that it was known that this statement was in reality a challenge which, according to the forms of procedure formulated by the Roman Catholic church for the trial of cases, had to be interposed before the defendant entered a plea to the charges against him.

In Droste-Messmer, Canonical Procedure, chapter 3, article 2, it is said: "Recusation is only a dilatory not a peremptory exception, and must be made in writing to the judge himself before the public pleading begins. After that time the recusant can enter this plea only upon making an affidavit that he had no knowledge of the reasons for the challenge before, or in case the grounds of the challenge arose, only afterwards." In a note to this article it is said: "It is the nature of a recusation that it must be made before the person thus challenged begins to exercise his jurisdiction. To let him do this would be to admit his authority."

The argument, therefore, that there was no challenge, or that it was not offered at the proper time, is wholly without foundation and needs no further discussion. What is claimed to be an order of the sacred congregation of the propaganda fide disposing of Father Murphy's appeal, is contained in a letter addressed to the bishop of date April 13, 1901, and signed by Cardinal Ledochowski and Aloysius Veccia, which is as follows:

"SACRED CONGREGATION OF THE PROPAGANDA OF THE FAITH.

"Protocol No. 43771.          ROME, April 13, 1901.

"Concerning the appeal of Rev. William Murphy.

"RT. REV. AND DEAR SIR: In reply to your letter of the

18th of March last, in which you make inquiry as to whether Rev. William Murphy, a priest of the Diocese of Lincoln, had appealed to this Sacred Congregation of Propaganda against a sentence of your Diocesan Curia, I have to inform you that the aforementioned priest did on the 20th of March, 1900, forward an appeal, but it was rejected; and that again on the 1st day of October, 1900, he made another appeal against a mandate which you had issued to him in your letter of the 29th of September of the same year, but that appeal was likewise rejected.

"Praying Almighty God to keep you in his holy keeping,

"I am, Rt. Rev. and dear Sir,

"Your most devoted Servant,

"M. CARDINAL LEDOCHOWSKI,

"ALOYSIUS VECCIA, *Secretary.*"

It is claimed that this is the original order disposing of Father Murphy's appeal, and in support of this theory the deposition of Francis Merchetti, auditor of the apostolic delegation to the United States and acting apostolic delegate for the church in the United States, was taken. He testifies that Cardinal Ledochowski was, at the date of the letter, prefect of the sacred congregation of propaganda fide and that Aloysius Veccia was secretary thereof. He states (and this is conceded by the parties) that the sacred congregation of the propaganda fide at Rome is the supreme tribunal for the determination of all questions relating to the spiritual and temporal affairs of the Roman Catholic church in the United States; that the officers of said tribunal are the prefect and secretary; that the decisions of the propaganda being determined, it is reduced to writing signed by the prefect and secretary and the original document is forwarded to one of the parties interested. He further states that the letter above set out is not a copy, but the original decree or decision entered in the case. This evidence is all objected to as incompetent, and we incline to the belief that the objection was well taken. We know of no court which is not required to keep some

record of its proceedings. In the trial had in the curia at Lincoln a very complete and minute record was made of all the proceedings in the case, and if there is a court ecclesiastical or of other kind which fails to make a record of its orders and decisions, then certainly the best evidence of what such unrecorded orders and decisions may be is the evidence of a member of the court. If the rules of the court require its decisions to be recorded, then a copy of the record properly identified is the best evidence of the decision: But if the rules do not require such a record to be made, we are unable to see how anyone except some member of the court participating in the decision is qualified to say what that decision is or was. The letter on its face shows that it was written in reply to an inquiry made by the plaintiff herein, and does not purport to be a decision of the appeal, but speaks of that decision as a past event, something that had taken place prior to the writing of the letter. The language is: "I have to inform you that the aforementioned priest did on the 20th of March, 1900, forward an appeal, but it was rejected, and that again on the 1st day of October, 1900, he made another appeal against a mandate which you had issued to him in your letter of the 29th of September of the same year, but that appeal was likewise rejected." The letter clearly speaks of the decision on these appeals as having been made at some time prior to the writing of the letter, and can not, as we see, be construed as an order then made rejecting these appeals or affirming the orders appealed from. Other letters from Rome were also offered touching this appeal, as well also as a document certified by a notary whose certificate was further attested to be in due form by officers of the government of Italy, in which he states that, at the request of Monsignor Veccia, secretary of the sacred congregation of the propaganda fide, he went to the secretary's office and was there shown a letter by the custodian of the archives addressed to Bishop Bonacum, a copy of which shows it to be the same letter above copied. This evidence was clearly incompetent, as we

know of no statute or rule of the common law which admits a certificate of a notary, however solemnly attested by other officials, to be received as evidence of matters of this character or of any matter except acts of their own committed to them by the laws of the state or country where they reside. In this connection it might be mentioned that a commission was taken out of the district court by the defendant, directed to Hector de Castro, our consul general at Rome, to take the deposition of Cardinal Gotti who, it appears, succeeded Cardinal Ledochowski as prefect of the sacred congregation of the propaganda fide, and of Monsignor Veccia and Monsignor Onronini, one of the objects being, as shown by the interrogatories propounded, to ascertain what disposition had been made by the sacred congregation of the propaganda fide of the appeals of Father Murphy, and this commission was returned by the consul general, with a statement that "he had personally interviewed each of the witnesses, who declined to answer their respective interrogatories, availing themselves, in their official position, of the rights conferred on them by the Laws of Guarantee of the Kingdom of Italy." It would appear from this return that these witnesses are not compelled to give evidence in this manner by the laws of the country where they reside. It may be that the plaintiff knew of the exemption extended to the officials composing the sacred congregation of the propaganda fide by the laws of Italy, and on that account made no effort to secure their evidence, and relied, and was compelled to rely, on the evidence contained in the bill of exceptions in his attempt to show that the defendant's appeal had been disposed of. If this be the case, he can not probably be charged with negligence in failing to obtain competent evidence to show what, if any, disposition has been made of that appeal; still, so long as he has not obtained and offered legal evidence determining the question, he is in the same position as any other litigant upon whom is cast the burden of proof upon a material issue of fact, and who is unable to sustain that burden because of the death of

the only witness who knew the fact, or the refusal of the witness to testify where the court has no means of compelling him to do so. In other words, where a party upon whom is cast the burden of proof is unable to furnish competent evidence, the court can not treat such inability to produce the evidence as an equivalent of the evidence itself.

It will be noticed, also, that the decree in the previous case, enjoining the plaintiff from commencing this action until the disposition by the appellate ecclesiastical tribunal of defendant's appeal, was entered on the 6th of January, 1902. The letter of Cardinal Ledochowski is dated April 13, 1901. If the defendant's appeal had been disposed of in the manner indicated by that letter, such disposition, being prior to the decree of January 6, 1902, should have been interposed as a defense to defendant's prayer for affirmative relief in that action. That decree, so long as it remains undisturbed, is an adjudication that on January 6, 1902, defendant's appeal from the judgment of the ecclesiastical tribunal at Lincoln had not been disposed of, and by that decree the fact that defendant's appeal was still pending on January 6, 1902, was *res judicata* for the purposes of this case. It was still open to the plaintiff to show that the appeal was disposed of subsequently to January 6, 1902, but he was precluded by the decree of that date from showing that it had been disposed of as early as April 13, 1901.

Because, as we think, the decree sought to be enforced was one entered by a judge disqualified to act, and further, because by the terms of the injunction of January 6, 1902, the plaintiff was enjoined from bringing this action until the appeal taken by Father Murphy had been determined, and the evidence failing to show that the appellate court has passed upon that question, we recommend that the judgment of the district court be in all things affirmed.

FAWCETT, GLANVILLE and ALBERT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is in all things

AFFIRMED.

The following opinion on rehearing was filed June 22, 1905. *Former judgment vacated and action dismissed:*

1. Courts: TRIAL OF TITLE TO PROPERTY: PARTIES. The courts will not entertain a controversy concerning the title or right of possession of real or personal property, except at the instance of some person or persons having or claiming a right thereto derived from, or recognized by, the laws of this state or of the United States.

2. Ecclesiastical Trials: REVIEW. The courts of this state will not review the process or proceedings of church tribunals for the purpose of deciding whether they are regular or within their ecclesiastical jurisdiction, nor will they attempt to decide upon the membership or spiritual *status* of persons belonging or claiming to belong to religious societies.

AMES, C.

With an exception disclosed by the following discussion, the former opinion, *ante,* p. 463, contains a sufficiently accurate and ample exposition of the record in this case, and its reproduction here is not requisite. · The authorities cited in that opinion seem to us also to suffice for the disposition of the action, although the conclusion we draw from them is the exact opposite of that there reached. The plaintiff styles himself in the title to his petition, and elsewhere in that document, "as bishop of the Roman Catholic church of the diocese of Lincoln," and seeks to recover in that capacity and not otherwise. The substance of the petition is that the defendant is, or was, a priest of the church and subject to the episcopal jurisdiction of the plaintiff, and that the plaintiff acting in his official capacity ordered the transfer of the defendant from Seward, Nebraska, where he had formerly been ministering, to Red Cloud, Nebraska, for like service, and that the defendant persistently refusing to obey the order, the plaintiff first suspended him from his priestly func-

tions, and afterwards pronounced against him the so-called greater excommunication which, it is said, assumes to interdict him from all Christian fellowship both in this life and in the life to come. It is further alleged that the defendant still remains contumacious and refuses to desist from his ministrations at the so-called "mission" of Seward, which includes a parish church building and parsonage at Seward, in Seward county, and a parish church at Ulysses, in Butler county. The prayer is, in brief, that the defendant may be enjoined from a continuance of the conduct complained of, and, incidentally, that he be required to turn over and deliver to the plaintiff the real estate mentioned and certain chattels, and that the title thereto *as against the defendant* may be quieted in the plaintiff.

Where the title of the property, or any of it, now is, or what lawful authority the plaintiff has over or concerning it, the petition does not aver. It is asserted by his counsel that he is a legal or equitable trustee of it, but the petition does not set forth any declaration of trust nor any facts or circumstances from which the law raises a constructive or resulting trust, so that the sole issue tendered by the petition is as to the spiritual or ecclesiastical *status* of the defendant as determined by the "laws, canons, statutes, discipline, rules, regulations and customs of the Roman Catholic church."

In the attitude of the pleader the matter of transference, or attempted transference, from one mission to another, has long ceased to be of importance, and it is manifest that if his contention is upheld, the defendant is not less disqualified from exercising the priestly office elsewhere than he is so at Seward and Ulysses. And it is solely because of his excommunication from the church that he is disqualified from exercising it there. So that the sole question which the court is asked to decide is, whether the defendant is catholic or recusant. All other relief sought by the petition is incidental to the determination of that controversy. Now the authorities cited in the

former opinion are unanimous to the effect that this is a question with which the lay courts in this country will have nothing to do. The only discordant note is the dissenting opinion of Judges Lawrence and Sheldon in *Chase v. Cheney*, 58 Ill. 509, 11 Am. Rep. 95; but whoever will read the majority opinion in that case will be convinced, we think, that the position of the remaining five judges, among whom were Judges Breese and McAllister, is invulnerable. The case did not differ essentially from that before us. An ecclesiastical court was proceeding, it was alleged irregularly and illegally, as regarded by church laws, to try and depose the plaintiff from the ministry so as to deprive him of the right to officiate or receive a salary as a clergyman of that denomination, and it was held that, inasmuch as the substantive question at issue was his *status* in the society, the courts would not interfere, although his salary and livelihood were dependent upon the decision of the church authorities.

The answer in this case begins by protesting that the petition does not state facts constituting a cause of action, and then proceeds by way of cross-petition to allege that the defendant, according to the laws, canons, statutes, rules, etc., of the Roman Catholic church has not been deprived of his *status* of a priest of that church, because his alleged excommunication, on account of the prejudice and disqualification of the bishop who pronounced the sentence, is void, and because it has been temporarily taken off or suspended by an appeal to a church court at Rome. "And that the said control, custody or administration of various properties of said Roman Catholic church, remaining always one and the same, is vested directly or indirectly, proximately or remotely, particularly or generally in all of the three following ecclesiastical persons in various degrees and at the same time, namely, in the pope, in the bishop, in the pastor, priest or rector of the said Roman Catholic church according to the laws, canons, statutes," etc., of that church, and that he is, and

has been, the pastor or rector of the mission of Seward according to the laws, canons, rules, etc., of said church, and therefore one of the persons entitled to the control thereof.

Whether or not these averments mean anything to a churchman we confess ourselves unable to say, but they are certainly without meaning to the courts of the state. Like the bishop, the defendant omits to say where the title to the property is, or to set forth any declaration of trust, or any facts or circumstances raising one by implication of law. But it is alleged that, in a prior suit, the defendant obtained from the district court a perpetual injunction restraining the bishop from again litigating any of the matters referred to, in the state courts, until the alleged appeal should be finally disposed of in the tribunal to which it was made.

This injunction strikes us as not the least remarkable of the proceedings under review. Let it be supposed to be valid, as it was held to be by the former opinion, and let it be supposed, also, that it shall finally be determined upon its merits and the decision made of record and exemplified in a satisfactory manner; and one of two consequences will be inevitable: either the courts of this state will sit in review of it as upon appeal, or, more properly, *certiorari,* a thing which reason and the authorities are unanimous in saying they can not do, or else they will humbly and unhesitatingly register and enforce the decree or sentence of an independent and alien power, having its seat of spiritual and temporal sovereignty in the ancient city of Rome; a proceeding for which there is no precedent in the United States, nor, it is believed, in any court whose records are written in the English language. But if neither of these consequences is admitted, then the injunction has no practical end or aim, and deals with no controversy of which the courts of this state can rightfully take cognizance, and is wholly void. And so we esteem it to be.

The second opinion in *Pounder v. Ashe,* 44 Neb. 672, a

leading case on the subject in this state, and which cites the principal leading cases thereon in other jurisdictions, so far from sustaining the former decision, is in direct conflict therewith. That case, as we gather from the somewhat meager statement of facts in the earlier decision in 36 Neb. 564, was begun by the trustees of a local protestant church society incorporated under the laws of this state. Their complaint was that no one could, according to the constitution and laws of their society, which derived their force and obligation from the statutes of the state, rightfully be employed or officiate, as pastor, in the property under their charge, unless he should be a member in good standing of their society and have the sanction and authority of a representative body, called in the opinion a conference. And it was alleged that Ashe had been expelled by the conference, but still persisted in officiating in the church buildings against the wishes and protest of the plaintiffs, who were unable to prevent him so doing without the aid of the court. The defendant contended that the proceedings of the conference, at the time of his removal from the ministry, were upon charges not constituting an offense against the discipline of the society, and that the proceedings were so irregular and informal that the body trying him did not acquire jurisdiction of the subject matter. With this defense, this court, in an opinion by the then Chief Justice HARRISON, expressly declined to have anything to do, quoting with approval the following from *German Reformed Church v. Seibert,* 3 Pa. St. 282:

"The decisions of ecclesiastical courts, like every other judicial tribunal, are final; as they are the best judges of what constitutes an offense against the word of God and the discipline of the church. Any other than those courts must be incompetent judges of matters of faith, discipline, and doctrine; and civil courts, if they should be so unwise as to attempt to supervise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do anything but improve either religion or good morals."

The court considered that it sufficed for the disposition of the case that the body, whose authority the trustees of the title were bound to respect, and who were empowered by the constitution of the society to decide upon the qualifications of the defendant, had condemned him. Whether the condemnation was regular or irregular, or with or without jurisdiction, or just or unjust, the court refused to inquire; it was enough to know that the sentence was pronounced by a body to whom authority was committed by the society for pronouncing a like sentence in any case. The court, having before it the persons recognized by law as having or representing the legal title to the property in dispute, contented itself with protecting such persons in its peaceable possession and enjoyment for the uses to which it had been devoted, and under the direction of the authorities designated by the articles of the association or discipline for its government. Such, we think, is the consensus of judicial opinion in this country.

The only recent case that has been brought to our attention that lends color or countenance to the former decision is that of *Bonacum v. Harrington*, 65 Neb. 831. The opinion in that case is seemingly somewhat self-contradictory. After having at considerable length and with great vigor, clearness and learning expounded the doctrine that the civil courts will not review the proceedings of church tribunals, nor concern themselves with the discipline, modes of procedure or jurisdiction of such bodies, or attempt to decide upon the spiritual or ecclesiastical *status* of members, or alleged members, of religious societies, the opinion denied intervention to a local incorporation, or its legal representatives, being, seemingly, the only body having, under the laws of the state, the title or right of possession of the property in dispute, and proceeded to dispose of the case with sole reference to the ecclesiastical *status* of the defendant. According to our view, and to the nearly unanimous voice of the authorities, the persons denied intervention were not only proper and necessary, but the only indispensable parties plaintiff to the action.

The opinion does indeed say that the property had, in that instance, been conveyed to the bishop, who was plaintiff, but the remark seems to have been casually made, and is not stated to have been founded upon the pleadings or evidence, and the fact was, apparently, regarded as of no importance or significance in the case.

It is assumed in the briefs and argument on both sides, and perhaps also in a vague way and extremely qualified sense, in the pleadings, that the title to the Seward and Ulysses property is in the Roman Catholic church. To our minds this is an inconceivable assumption. That church is not, in contemplation of the laws of this state, a corporation, or a partnership, or a legal entity of any sort, and does not claim so to be. It is a hierarchy composed of a series of clerical dignitaries of various ranks and degrees, scattered over the whole world, and deriving their power and importance from the papal court at Rome, to whom they owe allegiance, and from whom they are liable at any time to suffer degradation. That court claims to be an independent sovereign power, a political as well as an ecclesiastical state having universal dominion, superior to all other principalities and powers of whatever description and wherever situated. As such it can acquire territorial rights in Nebraska, if at all, only with the consent of its legislature, by treaty with the government at Washington. The parties evidently regard the title to the property in dispute to be in the church, in the sense that it is subject to church jurisdiction and government, in much the same way as the ultimate title and eminent domain of all property within the territorial boundaries of the commonwealth are said to be in the state. The pleadings of both parties in this case proceed upon the assumption that the church tribunals, both local and foreign, have a jurisdiction of their own over church property, or property devoted to church uses, and over members of the catholic priesthood, concurrent with, but superior to, that of the courts of the state, and that the whole duty of the latter, with respect to such matters, is to lend their aid for

the carrying into execution the judgments and sentences of the former. In former days, and in the mother country, such a pretense would have incurred the penalties of *præmunire,* and the application for the injunction, instead of having been granted, would have been visited with swift and severe punishment for contempt of the court to whom it should have been presented. In these days, such measures are not necessary or desirable, but the civil courts ought, nevertheless, jealously to guard their own dignity and prerogatives, lest precedent followed by precedent shall gradually encroach upon the domain of the civil law and revive the abuses of a bygone age.

It is recommended that the former decision of this court and the judgment of the district court be wholly reversed, vacated and set aside, and the cause remanded with directions that the action, both upon the petition and upon the cross-petition, be dismissed, each party to pay his own costs, but without prejudice to the future litigation of the rights of either party, if either has any, under the laws of this state, to the property in dispute.

LETTON and OLDHAM, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, it is ordered that the former decision of this court and the judgment of the district court be wholly reversed, vacated and set aside, and the cause remanded, with directions that the action, both upon the petition and upon the cross-petition, be dismissed, each party to pay his own costs, but without prejudice to the future litigation of the rights of either party, if either has any, under the laws of this state, to the property in dispute.

JUDGMENT ACCORDINGLY.