## Richmond

EMMETT PUCKETT, LINZY BREEDING, TRUSTEES OF THE
SPRING CITY PRIMITIVE BAPTIST CHURCH V.
TAULBEE JESSEE, ET AL.

May 3, 1954.

Record No. 4176.

Present, Hudgins, C.J., and Eggleston, Spratley, Miller, Smith
and Whittle, JJ.

The opinion states the case.

*G. Mark French* and *Glyn R. Phillips*, for the appellants.

*A. T. Griffith*, for the appellees.

Hudgins, C.J., delivered the opinion of the court.

On August 1, 1936, Floyd Viers and J. C. Stinson, as trustees of the Spring City Primitive Baptist Church, and George W. Thompson conveyed approximately one-half acre of land, on which there was an incomplete church building, to Taulbee Jessee, Eulis Smith and Homer Davis, trustees of the Spring City Missionary Baptist Church. The consideration for the conveyance was the payment of an indebtedness of $250 that Floyd Viers and J. C. Stinson had contracted on behalf of the Primitive Baptist Church in building a meeting house and installing fixtures on the lot described in the deed. The grantors reserved the right for the members of the Primitive Baptist denomination residing in the Spring City community to use the "Church house" one Sunday in each month for their preaching services, "which said Sunday is to be designated and agreed upon between the said parties . . . and the Missionary Baptist Church shall have the right to hold Sunday School and other church services in said church upon the said Sunday so designated at a time when said Sunday School and church services will not interfere with the said Primitive Baptist Church . . . "

The Missionary Baptist congregation accepted the conveyance and expended large sums in improvement of the building and the grounds. Thereafter, each congregation without objection used the premises for their separate services under the terms and conditions stated in the deed, until August, 1949, when a dispute arose between the two congregations as to their respective rights to the use of the church property under the deed of August 1, 1936.

This disagreement was not resolved, and on October 18, 1951, the trustees of the Spring City Primitive Baptist Church instituted this suit against the trustees of the Spring City Missionary Baptist Church. It is alleged in the bill that the Primitive Baptist Church and the Missionary Baptist Church are two separate and distinct religious societies;

that the Spring City Primitive Baptist Church acquired the property in fee by deed dated November 6, 1922, from George W. Thompson; that the Spring City Missionary Baptist congregation were using the premises without the consent of the Primitive Baptist congregation and that they had "totally excluded members of the Spring City Primitive Baptist Church . . . from preaching and having preached on said premises and in said building, the faith and order of the said Primitive Baptist Church aforesaid . . . "; that the deed of August 1, 1936, executed by Floyd Viers, J. C. Stinson and George W. Thompson, was null and void because the congregation of the Spring City Primitive Baptist Church had never authorized its trustees to sell the premises or any part thereof, nor had the proposed sale been submitted to or approved by the circuit court of Russell county, as required by Code section 57-15.

The prayer was that the members of the "Spring City Missionary Baptist Church be enjoined from using said premises . . . without the special consent and permission of your complainants and that your complainants and those who preach under them be given the exclusive possession and control of the said premises. . . . " Complainants' alternative prayer was that "if the court should believe that your complainants are not entitled to the relief above prayed for that they be granted the right to use said premises and buildings thereon as set out in the said deed dated on the 1st day of August, 1936. . . . "

Respondents in their answer admit the execution of the deed of November 6, 1922, but aver that at the time there was no Spring City Primitive Baptist Church in existence, and that no such church was organized prior to August 1, 1936, when the deed in question was executed and delivered. Therefore, respondents claim that title to the property never passed under the deed of November 6, 1922, or if it passed from George W. Thompson it reverted to him, and that he, by joining in the deed of August 1, 1936, conveyed good title to respondents as trustees for the Spring City

Missionary Baptist Church; that S. A. Fletcher, one of the trustees named in the deed of November 6, 1922, died; and that Floyd Viers and J. C. Stinson, the other two trustees, expended large sums in buying building material and fixtures which they used in the partial construction of a meeting house on the lot in question, all of which had been paid except $250 which was still due and owing on August 1, 1936; that the Spring City Missionary Baptist Church, relying upon representations made and the covenants in the deed, paid this sum of $250 and, in addition, expended sums in excess of $8,000 in fencing in the lot, repairing the old building, and constructing additional rooms suitable for religious services; and that since that time they have maintained the building and grounds in efficient and suitable condition for religious worship; that from the time of the execution of the deed and repairs to the building the congregations of the Missionary Baptist Church and of the Primitive Baptist Church used the premises, without objection or friction, under the terms of the deed, until the institution of this suit.

The trial court entered a decree refusing to grant complainants the right to exclusive possession and control of the premises, but stated in the decree that the Primitive Baptist Church was entitled to use the church property upon the conditions stated in the deed of August 1, 1936. From that decree the trustees of the Spring City Primitive Baptist Church obtained this appeal.

There is no substantial conflict in the evidence but, as there is a sharp difference of opinion as to the principle of law applicable thereto, it will be stated in some detail.

Under the rules and regulations of the Primitive Baptists, a regularly organized church of that denomination may "grant an arm" to one or more of its officers to hold meetings of members of like faith in other localities. The members or committee designated as an "arm" may not only hold meetings of the Primitive Baptists, but they may,

though not compelled to, organize a separate and independent church composed of members of the said faith.

There was a regularly organized church of the Primitive Baptists known as the Reeds Valley Church. This church, as early as October, 1922, appointed a committee designated as an "arm" to hold meetings of Primitive Baptists at Spring City. Copies of the minutes filed as exhibits indicate that various meetings of this "arm" were held in 1922, 1923, and 1927. These minutes indicate that each of these meetings, sometimes held at Spring City and sometimes elsewhere, was a meeting of the "arm" of the Reeds Valley Church and not a meeting of a separate and independent church at Spring City.

The officers of the Reeds Valley Church designated as an "arm" of that church held a meeting at Spring City on November 26, 1922, at which meeting Floyd Viers, S. A. Fletcher and J. C. Stinson were selected trustees of the church property. No application was made either by the "arm" or by the mother church to have the trustees so named appointed or approved by the circuit court of Russell county. These trustees and other members of the Primitive Baptist denomination, but not as members of the Spring City Church, erected a frame structure for a meeting house 60′ by 40′ on the lot conveyed by George W. Thompson. The house was not painted or completed on the inside. In it various members of the Primitive Baptist denomination residing in or visiting Spring City held preaching services at irregular intervals.

While Floyd Viers, J. C. Stinson, and others were trying to organize and establish a separate and independent church at Spring City, a division or split occurred among the members both at Reeds Valley and at Spring City. Linzy Breeding, one of the trustee complainants in this cause and a former member of the Reeds Valley Primitive Baptist Church, testified that after this division or split among the members, one faction of which was called the "Hellers" and the other faction "No Hellers," the members "dropped

everything right there until they got that settled up." Other testimony indicates that at irregular intervals each faction held meetings in the church at Spring City, but that a regular Priimtive Baptist Church at Spring City was not organized until 1949. Breeding further testified that "they (the members of the Primitive Baptist denomination at Spring City) went back to the Reeds Valley Church to ask for an arm to organize. They can do that. They dropped that until they got the split-up settled between the 'Hellers' and 'No Hellers', and left it alone that way, and had meetings there right along until 1949. They went back then and asked for an arm to organize at Spring City and they granted an arm there and some members from Reeds Valley come to Spring City, and some come from Hurricane Fork to help organize it."

This testimony is corroborated by the testimony of Emmett Puckett, a clerk of the Reeds Valley Church and a complainant in this cause. The minutes of the final meeting of the "arm" of the Reeds Valley Church held on March 12, 1949, seem conclusive on this point:

"This 12th, March, 1949.

"The arm of the Reeds Valley Church composed of the following members. to-wit:

Emmelee Rasnake
Lula Barton Rhea
Linzy Breeding
Bessie Breeding
John Breeding
Irene Breeding
Dora Breeding
Dorsie Rhea

"Met and after Divine Service Proceeded to organize a new Church by Selecting Presbytery composed:

Elder R. J. Hankins
Elder M. C. Miller
Elder L. E. Whitt
Elder Gideon Sparks

Deacons
Fuller Yates
Linzy Breeding
W. S. Rasnake

} Presbytery

"1st. Chosen Elder R. J. Hankins, Mod. W. S. Rasnake, Clerk.

"2nd. This Church shall be name Spring City Church.

"3rd. The Moderator Proceeded to Examine the body and found them to be sound and orthodox in Principle and faith after which the Charge was Delivered by Elder R. J. Hankins.

"4th. The body is now fully organized and is declared to be a church on Gospel Principles."

The situation confronting Floyd Viers and J. C. Stinson, the surviving trustees named in the deed of November 6, 1922, was unusual. They, in addition to the help they had extended in building the meeting house, had contracted to pay $250 to others for material used in the building and buying fixtures. There was no existing unincorporated religious society of the Primitive Baptists at Spring City from whom they could obtain proper authority as required by Code section 57-8 to sell the property. As creditors they held no specific lien on the land. Therefore, they could not proceed under the provisions of Code section 57-11. They had failed in their efforts to organize a church. The land conveyed to them as trustees appeared to be abandoned. The lot was described as having grown up with weeds and bushes; was a part of George W. Thompson's pasture; sheep and calves were sleeping under the house; the wooden steps had become old, dilapidated, and were

so rotten it was dangerous to use them; the weatherboarding was loose, much of it hanging down; and the roof was leaky. The value of the lot was $150 to $200. No member of the Primitive Baptist denomination seemed willing to assume any responsibility or to pay the $250 or any part thereof. The trustees as such had no authority to institute any proceedings.

Confronted with this situation, Floyd Viers and J. C. Stinson offered to sell the property to the Spring City Missionary Baptist Church upon the payment of the $250 and the reservation of certain rights to members of the Primitive Baptist denomination living in the community. This offer was accepted. The parties displayed good faith in their undertaking. They employed counsel, who prepared the deed of August 1, 1936, and required George W. Thompson, the original grantor, to unite therein. Among other things, it is stated in the deed:

"WHEREAS, the said Spring City Primitive Baptist Church, mentioned and described in said deeds, was never organized; and,

"WHEREAS, the said Floyd Viers and J. C. Stinson, Trustees as aforesaid, have expended certain monies in the erection of a meeting house upon said lot and incurred certain indebtedness in connection therewith, all of which had been paid except an indebtedness to Gus Strouth, Cleveland, Virginia, in a sum not exceeding the sum of $250.00 which last named sum has been paid by parties of the second part; and,

"WHEREAS, there has been duly organized and constituted in said community the said Spring City Missionary Baptist Church of which parties of the second part have been duly and legally elected, appointed and qualified as Trustees of said last named Church; and,

"WHEREAS, it is the desire of all parties in interest, since the said Primitive Baptist Church was never organized in said community, that said parties of the first part should convey said property to the said parties of the second part, with the

consideration that they would pay or assume payment of the said unpaid indebtedness due to the said Gus Strouth, as hereinbefore set out, subject to the reservations or conditions hereinafter set out; and,

"WHEREAS, said Spring City Missionary Baptist Church has accordingly paid the indebtedness aforesaid due to the said Gus Strouth, now, therefore . . . "

The rights of the members of the two congregations are stated in the deed as follows:

"It is expressly agreed and understood, however, that there is reserved hereby to the members of Primitive Baptist Church, residing in said community, the right to use the said church house one Sunday in each month for their preaching services to be conducted by a regularly ordained minister of the Primitive Baptist Church, which said Sunday is to be designated and agreed upon between the said parties of the second part or their successors and the said members of the said Primitive Baptist Church, but it is also agreed that the said Missionary Baptist Church, shall have the right to hold Sunday School and other church services in said church upon the said Sunday so designated at a time when said Sunday School and Church services will not interfere with the services of the said Primitive Baptist Church, as aforesaid.

"And it is further agreed that the said members of the said Primitive Baptist Church, residing in said community, shall have the right to permit any regularly ordained minister of their Church, who may happen to pass through or be in the community temporarily, to hold preaching services in said church on occasions other than said Sundays selected by them, as aforesaid, so that said occasional services permitted under this paragraph shall be held at a time so as not to interfere or conflict with the regular services or use of said Church, by the said Missionary Baptist Church."

The Spring City Missionary Baptist Church accepted this deed and immediately proceeded to clean off the grounds, install a wire fence around the lot, make the necessary

repairs to the building, complete the construction on the inside, put a metal covering on the roof, complete the foundation, and build new concrete steps, at a cost of more than $3,500. New additions were made to the building at a cost of approximately $4,000, making a total expenditure of more than $7,500 in improvements.

Dr. J. T. Stinson, a regular ordained minister of the Missionary Baptist denomination, testified that he was pastor of the Misionary Baptist Church at Spring City from 1936 to 1942; that during these six years members of the Primitive Baptist Church and members of the Missionary Baptist Church, without discord or friction of any kind, used the church property under the terms and conditions set forth in the deed of August 1, 1936. That is, the Missionary Baptists used the church for their preaching services three Sundays a month, and the Primitive Baptists used it for their preaching services once a month.

The members of the respective congregations continued this use of the property, with slight variations agreeable to both parties, until August, 1949, when, according to the testimony of Linzy Breeding, a dispute arose over the use of the church. He said " . . . the Primitive Baptists were to have their time set for 11 o'clock on the second Saturday and Sunday of each month and the Missionaries seemed to hold over their Sunday School there and we couldn't get in the house to have our meeting at the time we were supposed to that was agreed to."

Taulbee Jessee, a member and trustee of the Spring City Misionary Baptist Church, testified "Linzy (Breeding) come to me one Sunday morning . . . and said he would like for us to start Sunday School a little earlier to give them more time." Later an officer of the Primitive Baptist Church wrote the officers of the Missionary Baptist Church demanding that the Missionary Baptists refrain from holding Sunday School or any other services on the Saturday and Sunday designated for the Primitive Baptists to have preaching services. The Missionary Baptists were unwilling to yield

to the demands of the Primitive Baptists. Nothing further seems to have been said about the matter until October 18, 1951, when the bill in this case was filed in which, for the first time, the Primitive Baptists demanded the exclusive possession and control of the property.

The decisive question presented is whether the present members of the Spring City Primitive Baptist Church on the facts stated are entitled to such exclusive possession of the property. As we view the case, it is not necessary for the decision of this question to determine whether there was an organized religious congregation capable of accepting the deed of November 6, 1922, or whether the property described therein had been abandoned and title reverted to the original grantor, or whether the grantors in the deed of August 1, 1936, were seized with such an interest in the property that they could convey a valid title. The rights of the parties depend, not on the technicalities of title, but on the application of basic principles of equity.

The evidence fails to show the number and names of those who, it is now claimed, were members of the Spring City Primitive Baptist Church from 1922 to 1949. The names of some of the Primitive Baptists attending the meetings of the Reeds Valley Church and the "arm" of that church at Spring City are stated in the minutes, but it appears from the minutes and the testimony that the parties whose names are given were members of the Reeds Valley Church, or a committee of that church. The positive evidence is that members of the Primitive Baptist denomination living in the community of Spring City and visitors from other localities met irregularly in the building in question, both before and after August 1, 1936. After this date, the members of the Primitive Baptist denomination and the members of the Missionary Baptist Church at Spring City acquiesced in the right of the other to the use of the premises under the terms and conditions set forth in the deed of August 1, 1936.

This controversy arose thirteen years after the property was acquired and used in large part by the Spring City

Missionary Baptists. Members of the Primitive Baptist denomination in the Spring City community, whoever they might have been, during all this time knew or had opportunity of knowing that the Spring City Missionary Baptist congregation had assumed management and control of the property, had paid off the indebtedness and expended large sums of money in improvement of the premises.

Equitable principles should be applied in controversies between two unincorporated religious societies as well as between individuals or corporations. One of the maxims of equity is that he who seeks equity must do equity. Another maxim is that equity aids only the vigilant. It will not assist one who has slept too long on his rights. A court of equity is never active in relief which is against conscience or public convenience. It has always refused to give its aid to stale demands where the party has slept upon his rights and acquiesced in adverse use thereof to the prejudice of another for a great length of time. "Nothing can call forth this court into activity, but conscience, good faith, and reasonable diligence. Where these are wanting the court is passive and does nothing. Laches and neglect are always discountenanced." *Doggett, et al* v. *Helm, et al,* 17 Gratt. (58 Va.) 96.

In *Inge* v. *Inge,* 120 Va. 329, 336, 91 S. E. 142, Judge Kelly speaking for the Court quoted with approval the following extract from Merwin's Equity & Equity Pl. sec. 908:

"From the nature of the case, no rigid rule can be laid down as to what delay will constitute laches; every suit must depend upon its own circumstances. But whenever the delay fairly justifies the inference of acquiescence in the adverse claim, or whenever it has been of such a character as to induce other persons to alter their circumstances or conduct, so that the element of estoppel is introduced, a court of equity will commonly hold the delay to operate as an absolute bar." *Camp Manufacturing Co.* v. *Green,* 129 Va. 360, 106 S. E. 394; *Milligan* v. *Milligan,* 145 Va.

184, 133 S. E. 672; *O'Neill* v. *Cole* 194 Va. 50, 72 S. E. (2d) 382; 7 Michie's Jur., Equity 34, p. 60.

In the *Greek Catholic Church of St. Michaels* v. *Archbishop Platon Roizdestvensky, et al*, 67 Colo. 217, 184 Pac. 295, 19 A. L. R. 690, the facts were that a lot was purchased and a meeting house built thereon by the members of a Greek Catholic Church who were under the Pope. Later the lot was conveyed to trustees for the Russian Orthodox Church under the Czar or the Holy Synod. This last named congregation from 1904 to 1913 expended between $3,000 and $4,000 in improving the property and paying off the mortgage upon it. On March 15, 1913, the "Greek Catholic Church of St. Michaels" instituted a suit against the archbishop, the holder of the legal title for the benefit of the Russian Orthodox Greek Catholic Church, in which it was charged that the property had been illegally conveyed and praying that the deed be set aside and removed as a cloud upon plaintiff's title. The court overruled the contention that, because the deed was absolutely void, the doctrine of laches did not apply, and held that the delay in instituting the proceedings to recover the church property from a denomination other than that in which the church was organized, until after the debts had been paid and valuable improvements placed upon the property, prevented a recovery. The court concluded its opinion as follows: "We can see no equity in returning to the plaintiff the property with additions made and debts removed which would not have been made or removed if the plaintiff's action had been prompt." 45 Am. Jur., Religious Societies, sec. 69, p. 779; 76 C. J. S., Religious Societies, sec. 73, p. 858; Annotation, 76 A. L. R. 304.

In 4 Pomeroy's Equity Jur. (4th ed.), sec. 1442, p. 3419, the author quotes the following extract from Lord Selborne's opinion in *Lindsay Petroleum Co.* v. *Hurd*, L. R. 5 P. C. 221: "The doctrine of laches in courts of equity is not an arbitrary or technical doctrine. Where it would be practically unjust to give a remedy, either because the party has,

by his conduct, done that which might fairly be regarded as equivalent to a waiver of it, or where, by his conduct and neglect, he has, perhaps, not waiving that remedy, yet put the other party in a situation in which it would not be reasonable to place him if the remedy were afterward to be asserted in either of these cases, lapse of time is most material."

The following excerpt is quoted from the same opinion by the author at p. 3422, footnote 64: "But in every case, if an argument against relief which otherwise would be just is founded upon mere delay, that delay, of course, not amounting to a bar by any statute of limitations, the validity of that defense must be tried upon principles substantially equitable. Two circumstances, always important in such cases, are the length of the delay and the nature of the acts done during the interval, which might effect either party and cause a balance of justice or injustice in taking one course or the other."

We are in accord with the conclusion of the learned chancellor in the trial court who, in applying the foregoing equitable principles, said: "it would be inequitable and unjust to grant the relief prayed for in the bill of complaint." Decree

*Affirmed.*