NEW YORK ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH ET AL. *v.* EVERETT FISHER ET AL.

COTTER, C. J., BOGDANSKI, PETERS, HEALEY and PARSKEY, Js.

Argued June 12—decision released August 19, 1980

*James F. Stapleton,* with whom was *Allan B. Taylor,* for the appellants-appellees (plaintiffs).

*James R. Fogarty,* with whom, on the brief, were *Robert A. Epstein* and *James J. Huron,* for the appellees-appellants (named defendant et al.).

PETERS, J. This case involves a dispute over the ownership of church property arising out of a disagreement about the withdrawal of a local church from its prior affiliation with a hierarchical church organization.

New York Annual Conference of the United Methodist Church and its resident bishop, W. Ralph Ward, Jr., brought this action against the Round Hill Community Church, Inc., of Greenwich and

six individual defendants[1] for a declaratory judgment and other legal and equitable relief to determine their interest in the church property, and to enjoin the defendants from interference with the conduct of church services by a duly appointed Methodist minister and from use of church property for purposes not authorized by the church hierarchy. The defendants counterclaimed seeking, inter alia, a declaratory judgment that Round Hill Community Church, Inc., owns the disputed property and an ancillary injunction to enjoin the plaintiffs from interfering with the defendants' installation of a locally appointed non-Methodist minister. Following a lengthy trial, the trial court, *Berdon, J.*, rendered judgment for the defendants without ruling on the defendants' claims of waiver, estoppel, unjust enrichment and unclean hands. From that judgment the plaintiffs have appealed and the named defendant et al. have cross appealed.[2]

The underlying facts, found in the memorandum of decision and other material uncontested parts of the proceedings at trial; *Pandolphe's Auto Parts,*

[1] Eight defendants were originally named in the complaint. One of them, the attorney general of the state of Connecticut, declined to take part in the case on the ground that he did not believe that it was in the public interest for him to participate in the litigation. Six of the remaining seven defendants are individuals who, at the time of trial, held positions of office in the seventh defendant, Round Hill Community Church, Inc., five of them as trustees and one of them, Banks T. Adams, Jr., as chairman of the Official Board and Pastoral Relations Committee. Two of the trustees, Gordon Reed and J. Stanford Smith, did not participate in the appeal. The remaining three trustees are Everett Fisher, John Mayer and Jeremiah Milbank, Jr. Fifteen individual members of the Round Hill Community Church subsequently intervened as codefendants in the action.

[2] The defendants on whose behalf the cross appeal was filed are Banks T. Adams, Jr., Everett Fisher, John Mayer, Jeremiah Milbank, Jr., and Round Hill Community Church, Inc.

*Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980); establish the following: A local church having a hierarchical relationship with the United Methodist Church[3] was begun in the Round Hill area of Greenwich in the early part of the nineteenth century. Known as the Round Hill Methodist Episcopal Church, it was first located, in 1828, on property deeded in trust to the Methodist Episcopal Church in 1827. Subsequently, in 1871, the church acquired other property from William S. Brown, again in trust for the Methodist Episcopal Church, to which the church sanctuary was then moved, the original parcel becoming a cemetery for the congregation.

In the early part of this century, the Round Hill Methodist Episcopal Church was a struggling country church with a declining membership. From 1907 to 1913, the church may have been temporarily closed and was at least inactive. The Reverend Harold E. Wilson, a Methodist minister and a member of the New York East Annual Conference[4] was appointed in 1919 by the Methodist bishop to serve as a part-time "supply" pastor to the church at Round Hill. At the request of the congregation, the Reverend Wilson was, after two years of service, appointed as its full-time pastor.

On February 14, 1921, eleven individuals who constituted the official board of the Round Hill Method-

---

[3] The roots of the United Methodist Church are in the Methodist societies organized by John Wesley in 1729 in England. The church was formally organized in this country in 1784 as the Methodist Episcopal Church. The present United Methodist Church evolved in 1968 from a background of merger and splits. The United Methodist Church and its predecessor organization are sometimes hereafter referred to as the Methodist Church.

[4] The New York East Annual Conference was the predecessor of the plaintiff New York Annual Conference.

ist Episcopal Church met at the church in order to organize a community church. The minutes of that meeting provided in part: "A Motion was made and seconded that the Round Hill Methodist Church be made a Community church. A committee to look after the By Laws of the Community church discussed, the move (sic) was made and seconded that Rev. H. Wilson, Mr. Huyler and Mr. Marshall be the committee. . . . It was voted that Rev. Wilson see Rev. Rogers, pastor of the North Greenwich Congregational church, and have a talk with him about joining their church with ours." The North Greenwich Congregational Church did eventually merge with the Round Hill Church.

From 1921 onwards, the church formerly known as the Round Hill Methodist Episcopal Church became known as the Round Hill Community Church (hereinafter Round Hill). The significance of this change is the central issue in the case before us. On the one hand, Round Hill never voted to abandon the Methodist Church, and continued, until 1978, to occupy Methodist Church property, to be led by Methodist ministers and to pay Methodist assessments. Neither Reverend Wilson nor the members of the official board of the church took any steps to withdraw their individual memberships in the Methodist Annual Conference. On the other hand, Round Hill, after 1921, held itself out as a community church in its corporate affairs[5] and in its relationship to the community. The ambiguity

---

[5] In 1923, when Round Hill Community Association, Inc., was organized to take title to real property held for Round Hill, this nonstock corporation was not organized as an ecclesiastical corporation and its articles of association made no reference to the Methodist Church. In 1952, when Round Hill itself was incorporated as an ecclesiastical corporation, its incorporation made no reference to the Methodist Church.

of the action taken in 1921 is reflected in the later official documents of the Round Hill Church, which note that the church became a community church "[w]hile not actually severing its connection with the Methodist Episcopal denomination."

As a community church, Round Hill prospered. It acquired substantial amounts of real property, title to which was taken either in the name of Round Hill Community Association, Inc., or in the name of trustees for the Round Hill Community Church or Round Hill Community Church, Inc. Round Hill has also since 1921 accumulated substantial endowment, retirement and miscellaneous funds.

In the years between 1921 and 1978, the ministers at Round Hill were all Methodists. Reverend Wilson's successors were selected by Round Hill and appointed by the bishops of the Methodist Church. The present controversy arose when, in 1978, the Round Hill congregation voted to appoint, as pastor of Round Hill, the Reverend Alvin Brewer, a Congregational minister. The Methodist Church, acting through Bishop Ward, attempted unsuccessfully to designate and install a Methodist minister, Reverend Hansen, in place of Reverend Brewer. The plaintiffs claim that the defendants' insistence upon a minister who is not a Methodist means that the defendants have now in effect withdrawn from the Methodist Church and have forfeited their right to use or take church property which is subject to a Methodist trust. The defendants deny the continued existence of a Methodist trust, claiming that Round Hill is and has been since 1921 a nondenominational community church, independent of the Methodist Church.

The trial court, after satisfying itself that the procedural requirements for an action for a declaratory judgment had been met, addressed and resolved a number of issues. First, the court concluded that its exercise of authority to determine the present controversy would not contravene constitutional prohibitions against civil entanglement in ecclesiastical disputes. Second, the court concluded that Round Hill was independent in polity, name and finances from the Methodist Church, despite the relationship with the Methodist Church that continued to exist because Round Hill ministers were Methodists. In conjunction with this conclusion, the court rejected the plaintiffs' argument that they had no knowledge of the actions of the Round Hill congregation, finding both imputed knowledge because of the knowledge of Methodist ministers as agents of the Methodist Church and actual knowledge on the part of others in the Methodist hierarchy. Third, the court concluded that Round Hill had full rights to all of the property used by the church, a direct right to property deeded to it after 1921, and a right arising out of adverse possession and laches to property whose record title ran to trustees for the Methodist Church. On these bases, the court granted declaratory and injunctive relief to the defendants. The court declined to consider the defendants' claims that the plaintiffs were also barred from recovery by waiver, estoppel, unclean hands and unjust enrichment.

On this appeal, the plaintiffs challenge as error the trial court's second conclusion, that Round Hill is a church independent of the Methodist Church, and the trial court's third conclusion, that Round Hill has title to and the right to control all of the real and personal property that is the subject mat-

ter of this litigation. The defendants, in their cross appeal, claim that the trial court erred when it concluded that it was unnecessary to consider the defenses of waiver, of estoppel, of unclean hands, and of unjust enrichment. We will consider each of these contentions seriatim.

## I

Before we proceed to the merits of these issues, we must review, as did the trial court, what authority we may constitutionally exercise, as a civil court, to adjudicate property disputes involving autonomous ecclesiastical organizations. The first and fourteenth amendments to the United States constitution protect freedom of religion by forbidding governmental establishment of religion and by prohibiting governmental interference with the free exercise of religion. It is now well established that "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." *Presbyterian Church* v. *Mary E. B. Hull Memorial Presbyterian Church,* 393 U.S. 440, 449, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969); *Jones* v. *Wolf,* 443 U.S. 595, 602, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979); *Serbian Eastern Orthodox Diocese* v. *Milivojevich,* 426 U.S. 696, 724–25, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976); *Maryland & Virginia Churches* v. *Sharpsburg Church,* 396 U.S. 367, 368, 90 S. Ct. 499, 24 L. Ed. 2d 582 (1970) (Brennan, J., concurring). In language often quoted, it was held, in *Watson* v. *Jones,* 80 U.S. (13 Wall.) 679, 728–29, 20 L. Ed. 666 (1871) :[6] "In this

---

[6] *Watson* v. *Jones,* 80 U.S. (13 Wall.) 679, 20 L. Ed. 666 (1871), which was decided before the first amendment was incorporated within the protection of the fourteenth amendment; *Everson* v. *Board of Education,* 330 U.S. 1, 15, 67 S. Ct. 504, 91 L. Ed. 711 (1947) (establishment clause); *Cantwell* v. *Connecticut,* 310 U.S.

country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding on all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for."

The principle of deference to ecclesiastical adjudication of disputes concerning ecclesiastical doctrines and practices does not rest on the mandates

---

296, 303, 60 S. Ct. 900, 84 L. Ed. 1213 (1940) (free exercise clause); has been accorded constitutional status. See *Presbyterian Church* v. *Mary E. B. Hull Memorial Presbyterian Church,* 393 U.S. 440, 446–49, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969); *Kedroff* v. *St. Nicholas Cathedral,* 344 U.S. 94, 116, 73 S. Ct. 143, 97 L. Ed. 120 (1952).

of the constitution alone. Secular courts should view with skepticism their competence to decide ecclesiastical questions, which are often as markedly arcane and complex as they are heatedly controverted. *Watson* v. *Jones,* supra, 733; *Bonacum* v. *Harrington,* 65 Neb. 831, 835, 91 N.W. 886 (1902); Chafee, "The Internal Affairs of Associations Not for Profit," 43 Harv. L. Rev. 993, 1023–26 (1930); comment, "Judicial Intervention in Disputes Over the Use of Church Property," 75 Harv. L. Rev. 1142, 1172–73 (1962). Furthermore, courts should be alert to the value, in a pluralistic democratic society, of affording latitude to autonomous associations to conduct their own affairs without unnecessarily intrusive judicial supervision. Chafee, supra, 1027–1029; Weisbrod, The Boundaries of Utopia, 183–85 (1980).

Nonetheless, the principle of deference must be applied in accommodation with the competing principle that "[t]he State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." *Jones* v. *Wolf,* supra, 602; *Presbyterian Church* v. *Mary E. B. Hull Memorial Presbyterian Church,* supra, 445. It is now well established that state judicial intervention is justified when it can be accomplished by resort to neutral principles of law arising out of the law of property and of trusts that eschew consideration of doctrinal matters such as the ritual and liturgy of worship or the tenets of faith. *Jones* v. *Wolf,* supra, 602; *Presbyterian Church* v. *Mary E. B. Hull Memorial Presbyterian Church,* supra, 449; see *Maryland & Virginia Churches* v. *Sharpsburg Church,* 396

U.S. 367, 370, 90 S. Ct. 499, 24 L. Ed. 2d 582 (1970) (Brennan, J., concurring); *Clough* v. *Wilson,* 170 Conn. 548, 552–54, 368 A.2d 231 (1976).

Because disputes involving church property have arisen with unfortunate regularity, there are well-developed guidelines for us to follow in the application of neutral principles of law. The basic rules, laid down in *Watson* v. *Jones,* supra, establish a two-stage test. If property is dedicated by way of an express trust either to the general or to the local church, the terms of the trust will be enforced. In the absence of an express trust, the court must determine ownership of the property on the basis of the polity of the general and the local church: if the property is held by a local church which is independent of the general church, the property is subject to control by the decision of the majority of the local church; if, however, the property is held by a local church which is connected as a subordinate member to a hierarchical general church, then rights to the property are to be decided by the hierarchical church's superior ecclesiastical tribunal. *Watson* has been followed in this state in *Independent Methodist Episcopal Church* v. *Davis,* 137 Conn. 1, 13, 74 A.2d 203 (1950), and in *Trustees of Trinity Methodist Episcopal Church* v. *Harris,* 73 Conn. 216, 224, 47 A. 116 (1900).

*Jones* v. *Wolf,* decided by the United States Supreme Court only last year, added to the rules of *Watson* v. *Jones* by enlarging the scope of inquiry that a court may pursue, still following neutral principles, to determine the existence of a trust, and, presumably, the polity of a church and a local church's affiliation therewith. Under *Jones* v. *Wolf,* in deciding secular questions arising out of con-

cepts of property and trust law, civil courts may not only examine the deeds of conveyance or of trust but may also scrutinize certain religious documents, such as a church constitution, for language of trust in favor of the general church. See *Maryland & Virginia Churches* v. *Sharpsburg Church,* supra, 367–68.

The first amendment thus requires that civil courts defer to the highest court of the hierarchical church organization to resolve issues of religious doctrine or practice; *Jones* v. *Wolf,* supra; *Serbian Eastern Orthodox Diocese* v. *Milivojevich,* 426 U.S. 696, 724–25, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976); *Watson* v. *Jones,* 80 U.S. (13 Wall.) 679, 733–34, 20 L. Ed. 666 (1871); but does not prevent the civil courts from exercising general authority to resolve church property disputes. In the context of the case before us, we have both the authority and the duty to decide whether the property claimed by the Methodist Church and by Round Hill was expressly given in trust to either church. Where the property is not subject to an express trust, we must decide, without becoming entangled in religious controversy, what is the nature of the relationship between the Methodist Church and the local church, and the nature of the affiliation of Round Hill to the Methodist Church. Not all of these questions are still at issue. The trial court found that the property of the Round Hill church that was acquired before 1921 was given subject to an express trust in favor of the Methodist Church, but that the property subsequently acquired was not subject to such an express trust. The trial court also found that the

Methodist Church stands generally in a hierarchical relationship to its local churches.[7] None of these findings is contested on this appeal.

## II

The central issue on this appeal is the plaintiffs' claim that the trial court erred in holding that a new and independent church was organized at Round Hill in 1921. The trial court held that passage of the motion by the local church board that Round Hill be made a community church meant that the Round Hill Methodist Episcopal Church as of that moment ceased to exist. The court held that there was no need for the local church to make application to withdraw from the Methodist Church because there was nothing from which to withdraw. The court therefore did not inquire into the procedures for withdrawal specified in the Methodist Church's Book of Discipline, despite its recognition that, before 1921, the church at Round Hill had been affiliated in a hierarchical manner with a church whose polity was itself hierarchical.

The plaintiffs attack the conclusion of the trial court both doctrinally and factually. On a doctrinal level, they come close to arguing that a local church, once connected with a hierarchical general church, cannot disaffiliate therefrom without compliance with the explicit ecclesiastical law of that church. On a factual level, they dispute the infer-

[7] The 1976 Book of Discipline provides the following explanation of the connectional principle: "The principle that all United Methodists and United Methodist congregations are connected in a network of conciliar and legal relationships. This and the appointive system, in which the bishop has final authority, constitute two of the most distinctive features of United Methodist polity."

ence that Round Hill's new status as a community church necessarily implied a severance of its prior relationship with the Methodist Church.

Although it seems unlikely that even a hierarchical general church could bind its local churches in perpetuity to observe any and all of its ecclesiastical commandments, including its constraints on disaffiliation; but cf. *Serbian Eastern Orthodox Diocese* v. *Milivojevich,* supra, 712–15; we need not reach that issue. On the underlying facts found by the trial court, there is no factual basis for its conclusion that Round Hill had established its independence from the Methodist Church.

The facts that have a bearing on the continuance of a relationship between Round Hill and the Methodist Church are not limited to the passage of a motion on February 14, 1921, although the circumstances attending its passage are illuminating. At an official meeting of an official board of a church then concededly Methodist, a motion to become a community church was passed. The motion did not speak to the Methodist past of this church, nor did it say that an independent church was being founded. The motion appointed an implementing committee including the local church's minister, a pastor who had been and continued to be an active member of the Methodist Church. The motion did not contemplate relocation of the church, then and now on property known to be held in trust for the Methodist Church. It is true that the motion also suggested inquiry into ecumenical liaison with a congregation of another denomination, but the significance of that inquiry depends upon whether such a liaison is necessarily a definitive repudiation of the Methodist faith. That question, in turn,

treads on the forbidden ground of deviation from doctrine, upon which civil courts may not venture. *Jones* v. *Wolf,* 443 U.S. 595, 602, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979); *Maryland & Virginia Churches* v. *Sharpsburg Church,* 396 U.S. 367, 368, 90 S. Ct. 499, 24 L. Ed. 2d 582 (1970) (Brennan, J., concurring); *Presbyterian Church* v. *Mary E. B. Hull Memorial Presbyterian Church,* 393 U.S. 440, 449, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969). These facts establish that the church at Round Hill was preparing to move forward in a new direction but not that it had ceased to have a relationship with the Methodist Church.

A fact of particular importance is that Round Hill continued to occupy and to use, to exercise complete dominion over, property expressly entrusted to the Methodist Church. Courts in this and other jurisdictions have consistently held that, although the members of a local church may secede from a hierarchical system, they cannot secede and take the church property with them. *Independent Methodist Episcopal Church* v. *Davis,* 137 Conn. 1, 13, 74 A.2d 203 (1950); *McAuliffe* v. *Russian Greek Catholic Church,* 130 Conn. 521, 536, 36 A.2d 53, cert. denied, 323 U.S. 726, 65 S. Ct. 60, 89 L. Ed. 583 (1944); see, e.g., *Holiman* v. *Dovers,* 236 Ark. 211, 366 S.W.2d 197, 200, (1963); *Baker* v. *Ducker,* 79 Cal. 365, 374, 21 P. 764 (1889); *Trustees of Pencader Presbyterian Church* v. *Gibson,* 26 Del. Ch. 375, 383, 22 A.2d 782 (1941); *St. John's Presbytery* v. *Central Presbyterian Church of St. Petersburg,* 102 S.2d 714, 718 (Fla. 1958); *Apostolic Holiness Union of Post Falls* v. *Knudson,* 21 Idaho 589, 594, 123 P. 473 (1912); *Stallings* v. *Finney,* 287 Ill. 145, 149, 122 N.E. 369 (1919) (congregational church polity); *Stansberry* v. *McCarty,* 238 Ind. 338, 149

N.E.2d 683 (1958) (congregational church polity);
*Black* v. *Tackett,* 237 S.W.2d 855, 855–56 (Ky.
1951); *Hanna* v. *Malick,* 223 Mich. 100, 119, 193
N.W. 798 (1923); *Mt. Helm Baptist Church* v. *Jones,*
79 Miss. 488, 502, 30 S. 714 (1901); *Erie Conference
Central Office* v. *Burdick,* 440 Pa. 136, 139–40, 269
A.2d 735 (1970); Bogert, Trusts and Trustees § 398
(2d Ed. 1965).

As did the trial court, we find it useful to test
our conclusion by examining the events that
occurred between 1921 and 1978, when the present
controversy erupted. *Lar-Rob Bus Corporation* v.
*Fairfield,* 170 Conn. 397, 409, 365 A.2d 1086 (1976);
*Taft Realty Corporation* v. *Yorkhaven Enterprises,
Inc.,* 146 Conn. 338, 343, 150 A.2d 597 (1959). In
these intervening years, the church at Round Hill
continued to pay Methodist assessments and to
accept the appointment of Methodist ministers.
Indeed, the trial court expressly found that Round
Hill had a continuing relationship with the Meth-
odist Church because it continued to be led by
Methodist ministers. The church at Round Hill
described itself, in its literature, as having been
founded in 1810 rather than in 1921. In its official
history, Round Hill characterized its church as a
community church that had not actually severed its
connection with the Methodist Church.[8] In its 1977
Complete Statement of Principles, published on the
eve of the present controversy, Round Hill reiter-

---

[8] The publication, A History of the Round Hill Church: 1810 to
1967, refers to the events of 1921 in the following manner:

"In the spring of 1919 Harold E. Wilson, a Wesleyan graduate,
was appointed as pulpit supply at Round Hill. At that time Mr.
Wilson was in detached service engaged in work connected with the
Board of Home Missions. According to Mr. Wilson's notes, 'After
two years of this supply pastorate, plans for more intensive commu-
nity and church work culminated in Mr. and Mrs. Wilson being called

ated the absence of actual severance and noted the continued existence of a special relationship between the local church and the Methodist Church. "The disciplines of the United Methodist Church on the one hand and the independence of our Church on the other coexisted because of a 'live and let live' policy on their part and open-mindedness on ours." We consider these facts as more relevant than the form of Round Hill's incorporation or its various public listings. To the extent that Round Hill's conduct deviated from the normal practices of more orthodox Methodist churches, that deviance was, again, an ecclesiastical matter to be adjudicated not by us but by the proper authorities within the hierarchical church. *Jones* v. *Wolf*, supra, 602; *Serbian Eastern Orthodox Diocese* v. *Milivojevich*, supra, 709.

Viewed in their totality, the events that occurred at Round Hill in 1921, and thereafter until the present dispute arose in 1978, establish a relationship of ambiguous dimensions but not a severance, in 1921, of the connectional ties between the church at Round Hill and the Methodist Church. The trial court's conclusion to the contrary, because it is contrary to the underlying facts, is therefore in error and cannot stand. *Botticello* v. *Stefanovicz,*

to full-time work at Round Hill. This was quite a venture for a church which for nearly a hundred years had been cared for largely by short-term supply pastors.'

"However, under the leadership of the Wilsons, the church enjoyed a complete rebirth. Mr. Wilson, in a brief history of the church given on his tenth anniversary here wrote that, 'While not actually severing its connection with the Methodist Episcopal denomination, the church became a Community Church in name and fact, both in the inclusiveness of its spirit and membership and the program it attempted to carry on in the community.' This program has ever since been enjoyed by those of all faiths living in the Round Hill area."

177 Conn. 22, 27, 411 A.2d 16 (1979); *White Oak Excavators, Inc.* v. *Board of Tax Review,* 169 Conn. 253, 256, 363 A.2d 134 (1975); *Barrett-NonPareil, Inc.* v. *Stoll,* 168 Conn. 79, 82, 357 A.2d 481 (1975).

## III

The second issue on the plaintiffs' appeal is a challenge to the conclusions of the trial court with respect to rights in the property of the church at Round Hill. The trial court determined that all of the real and personal property belonged to the local church, and that the Methodist Church had forfeited whatever rights it might once have had, even in property originally expressly given in trust to the Methodist Church. These conclusions are inescapably linked with the trial court's earlier determination that Round Hill had severed its relationship with the Methodist Church in 1921. In view of our holding to the contrary in part II of this opinion, these conclusions cannot stand.

The property which is in dispute can usefully be divided into two segments, the property acquired by the Round Hill church before 1921, and the property acquired thereafter. With respect to the pre-1921 property, the trial court found that this property had been lost to the Methodist Church by operation of the law of adverse possession and the doctrine of laches. For the property acquired after 1921, the court found that the absence of an express trust and the creation of an independent church defeated the interest that the Methodist Church claimed to flow from the Methodist Church's Book of Discipline. We will address separately the issues raised by the pre-1921 and the post-1921 transactions.

The pre-1921 property consists of the so-called cemetery and Brown parcels, both of which were acquired in the nineteenth century by the Round Hill Methodist Episcopal Church. It is undisputed that the deeds for these parcels created express trusts in favor of the Methodist Church,[9] and that the Methodist Church would have had the right to enforce the express trust clauses, and to oust the defendants, had the present rupture occurred in

[9] The deed to the cemetery tract, the original church property, acquired in 1827 from Benjamin and Jonathan Husted, specified that the property was transferred to the named trustees: "in trust that they shall erect and build or cause to be erected and built thereon a house or place of worship for the use of the members of the Methodist Episcopal Church in the United States of America according to the rules and discipline which from time to time may be agreed upon and adopted by the ministers and preachers of the said church at their general conference in the said United States and in further trust and confidence that they shall at all times forever hereafter permit such ministers and preachers belonging to said church as shall from time to time be duly authorised [sic] by the General Conference of the ministers & preachers of the said church or by the Annual conferences authorised [sic] by the said general Conference to preach and expound God's holy word therein and in further trust & confidence that as often as any one or more of the places in office of the said trustees or their successors become vacant through any means whatever it shall be the duty of the stationed minister or preacher authorised [sic] as aforesaid who shall have the pastoral charge of the members of the said Church to cause such vacancy or vacancies to be filled as soon as conveniently may be according to the rules or plan which is or may be from time to time laid down or prescribed in the discipline of the said church."

Likewise the deed for the Brown tract, acquired in 1871, specified that the property was conveyed to the named trustees: "in trust that said premises shall be used and kept maintained and disposed of as a place of Divine Worship for the use of the ministry and membership of the Methodist Episcopal Church in the United States of America Subject to the disipline [sic] useage & ministerial appointments of said church as from time to time authorized and declared by the general conference of said church & the annual conference in whose bounds the said premises are situate & for no other purpose whatsoever in case said premises be used for any other purposes than as above described they shall revert to said W. S. Brown on return of the above mentioned sum of money. . . ."

1921. See *Watson* v. *Jones,* 80 U.S. (13 Wall.) 679, 722, 723–24, 20 L. Ed. 666 (1871); see generally *Jones* v. *Wolf,* 443 U.S. 595, 600–603, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979). It is equally clear that the Methodist Church is not immune, simply because of its religious character, from the operation of adverse possession or of laches if it takes no action in the face of open and uninterrupted appropriation of its property for a different religious community. *Burrows* v. *Holt,* 20 Conn. 459, 465 (1850); *Camp* v. *Camp,* 5 Conn. 291, 303 (1824). There is, finally, agreement about the elements essential to the law of adverse possession; General Statutes § 52-575; *Ruick* v. *Twarkins,* 171 Conn. 149, 155, 367 A.2d 1380 (1976); *Wadsworth Realty Co.* v. *Sundberg,* 165 Conn. 457, 462, 338 A.2d 470 (1973); *Robinson* v. *Myers,* 156 Conn. 510, 517, 244 A.2d 385 (1968); and to the doctrine of laches. *Bozzi* v. *Bozzi,* 177 Conn. 232, 239, 413 A.2d 834 (1979); *Leary* v. *Stylarama of New Haven, Inc.,* 174 Conn. 217, 218–19, 384 A.2d 377 (1978); *Robinson* v. *Myers,* 156 Conn. 510, 519, 244 A.2d 385 (1968); *Owens* v. *Doyle,* 152 Conn. 199, 207, 205 A.2d 495 (1964); *Pascale* v. *Board of Zoning Appeals,* 150 Conn. 113, 119, 186 A.2d 377 (1962). What is at issue is the application of these principles to the facts found by the trial court.

The question raised with regard to the applicability of the law of adverse possession is straightforward. Adverse possession requires "that the owner shall be ousted of his possession and kept out uninterruptedly for a period of fifteen years, by an *open, visible and exclusive possession by the claimant* without the license or consent of the owner and under a claim of right." (Emphasis added.) *Wadsworth Realty Co.* v. *Sundberg,* supra, 462. The trial court concluded that Round Hill, upon its orga-

nization as a community church in 1921, took possession of the pre-1921 property, ousted the Methodist Church, and thereafter maintained possession openly, visibly and exclusively for more than fifty years. The plaintiffs deny that the defendants' possession was adverse. We agree with the plaintiffs. The plaintiffs correctly observe that the relationship between Round Hill and the Methodist Church was at best marked by ambiguity, by an agreement to "live and let live." The defendants concede that the two churches did live in harmony. The same facts that point to the absence of a severance in 1921 rebut the conclusion of an ouster before 1978. As long as Round Hill maintained a harmonious, albeit attenuated, relationship with the Methodist Church, it failed to occupy the pre-1921 property by an open, visible and exclusive possession. Possession is not adverse when it is pursuant to and consistent with the owner's legal or equitable title. See *Burrows* v. *Holt,* 20 Conn. 459, 464 (1850).

The trial court's reasoning with regard to laches is, like its holding with regard to adverse possession, derived from its erroneous conclusion that Round Hill had established itself as an independent church in 1921. Laches consists of two elements: (1) an inexcusable delay by a party seeking enforcement of a claim and (2) resulting prejudice to the party defending against enforcement of the claim. *Bozzi* v. *Bozzi,* 177 Conn. 232, 239, 413 A.2d 834 (1979); *Leary* v. *Stylarama of New Haven, Inc.,* 174 Conn. 217, 218–19, 384 A.2d 377 (1978); *Robinson* v. *Myers,* 156 Conn. 510, 519, 244 A.2d 385 (1968); *Owens* v. *Doyle,* 152 Conn. 199, 207, 205 A.2d 495 (1964); *Pascale* v. *Board of Zoning Appeals,* 150 Conn. 113, 119, 186 A.2d 377 (1962). The Methodist Church can only be faulted for inexcusable

delay in its assertion of its claim to the pre-1921 property if it had a claim that it should have pressed in 1921. As long as no event had occurred which required vindication, as long as Round Hill had not actually severed its relationship with the Methodist Church, there was no occasion that required action and a fortiori no inexcusable delay.

The facts of the present controversy serve to distinguish this case from the cases in other jurisdictions where the doctrine of laches has been found applicable. In *Gabster* v. *Mesaros,* 422 Pa. 116, 220 A.2d 639 (1966), on which the trial court relied, a local church abandoned its prior connection with the Church of Rome to associate itself with an eastern sect known as the Carpatho-Russian Greek Catholic Orthodox Church. For thirty years, the local parish was served and its property administered by priests assigned and removed by a bishop of the eastern sect. In *Russian Orthodox Greek Catholic Church* v. *Burdikoff,* 117 Ohio App. 1, 189 N.E.2d 451, appeal dismissed, 174 Ohio 140, 186 N.E.2d 847 (1962), cert. denied, 374 U.S. 808, 83 S. Ct. 1694, 10 L. Ed. 2d 1033 (1963), a local Russian Orthodox Greek Catholic church declared itself to be an autonomous church affiliated with the Metropolia, and, for thirty-five years, received financial and spiritual leadership from the Metropolia rather than from its prior leader, the Patriarch of Moscow. See also *Greek Catholic Church of St. Michaels* v. *Roizdestvensky,* 67 Colo. 217, 184 P. 295 (1919); *Puckett* v. *Jessee,* 195 Va. 919, 81 S.E.2d 425 (1954). In these cases, a court might well conclude that the severance of the local church from its previous affiliation was so uncategorical and so unequivocally manifested by its new and different ecclesiastical leadership that the spiritual jurisdiction of the

former ecclesiastical hierarchy had become subject to waiver, estoppel and laches. A former hierarchy's knowing acquiescence, for an extended period of time, in the existence of conditions belatedly made the subject of complaint, is the kind of inexcusable delay which allows equity to withhold the relief belatedly sought. The facts here, however, unlike those in *Gabster* and in *Burdikoff*, show neither the appointment of different ministers nor the financial support of a competing ecclesiastical association. Under these circumstances, the events before 1978 fail to establish an inexcusable delay on the part of the plaintiffs and hence defeat the claim of laches on the part of the defendants.

We turn, finally, to resolution of the issues that concern ownership of property acquired by the church at Round Hill after 1921. This property consists of (1) five parcels of land,[10] (2) endowment and retirement funds and (3) other miscellaneous funds. The trial court held, in a conclusion not challenged on this appeal, that none of this property was expressly given in trust to the Methodist Church. Applying the rules of *Watson* v. *Jones*, 80 U.S. (13 Wall.) 679, 722–23, 20 L. Ed. 666 (1871), that determine church property rights in the absence of an express trust, the trial court went on to conclude that, because Round Hill had become an

---

[10] These properties are known as the Association property, an eleven-acre tract purchased in 1926 on which stand the community house, parsonage and sexton's house; the Richardson property, a one-half acre site adjacent to the Brown property and on which stands a part of the religious school building; the Evans property, a one-half acre parcel adjacent to the Richardson property; the Mead property, originally eleven, now four, acres; and the Kenworthy property, which is subject to a life estate. The Richardson, Evans, Mead and Kenworthy properties were acquired in 1949-50, 1956, 1963 and 1975, respectively.

independent church in 1921, the property belonged to Round Hill rather than to the Methodist Church. Consistently with the logic of its position, the trial court did not pursue what rights the parties might have to this property if it were to be determined, as we have, that Round Hill continued to have some kind of relationship with the Methodist Church after 1921.

The plaintiffs argue that the continued connection of the church at Round Hill to the Methodist Church requires application of the connectional rules of *Watson* v. *Jones,* supra. Under these rules, if they apply, courts are instructed to look with a secular eye upon church documents construed according to neutral legal principles in order to decide whether property donated to a local church becomes the property of the hierarchical church in the event of a schism or withdrawal. *Jones* v. *Wolf,* 443 U.S. 595, 602–604, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979); see also *Maryland & Virginia Churches* v. *Sharpsburg Church,* 396 U.S. 367, 370, 90 S. Ct. 499, 24 L. Ed. 2d 582 (1970) (Brennan, J., concurring); *Presbyterian Church* v. *Mary E. B. Hull Memorial Presbyterian Church,* 393 U.S. 440, 449, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969). The plaintiffs maintain that governing provisions of the Book of Discipline of the Methodist Church, as well as other church documents, locate title in the plaintiffs. The defendants' argument to the contrary relies not only on the claimed absence of a continued connection between Round Hill and the Methodist Church but also on their special defenses of waiver, estoppel, unclean hands and unjust enrichment that the trial court failed to reach. The latter questions have been preserved by the defendants' cross appeal.

It is readily apparent that the record before us does not permit us to adjudicate these competing claims to the post-1921 property. The case must be remanded for further proceedings in the trial court for further findings of fact and law.

Our conclusion that there continued to be, until 1978, a relationship, a connection, between Round Hill and the Methodist Church raises a number of questions that the trial court did not address. Even if Round Hill was then connected to the Methodist Church in a hierarchical fashion, property deeded by express trust to Round Hill would remain subject to the express terms of its trust. *Watson* v. *Jones,* supra. The right of a donor to dedicate property to a local church is a right which a donor may exercise whether the property is confided to a local church with a congregational form of government or to a local church associated, as is Round Hill, with a hierarchical polity. *Watson* v. *Jones,* supra, 723. Although the trial court determined that title to the property acquired after 1921 was taken in the name of Round Hill, the court made no finding about whether the property was dedicated by way of an express trust to Round Hill. It considered whether the property was subject to an express trust in favor of the general church, the Methodist Church, and determined that it was not, but failed to consider the possibility of an express trust in favor of the local church. Upon remand, this question must be resolved by examination of the documents by which the various parcels of property and the various funds were conveyed to Round Hill. *Jones* v. *Wolf,* supra, 604. To the extent that the

conveyances are found to have created express trusts, the rights of the church at Round Hill will have been definitively established. *Watson* v. *Jones,* supra, 722–23.

It is not unlikely that some or all of the property to which Round Hill holds title came to it without the benefit of an express trust. As to this property, the trial court on remand must consider relevant ecclesiastical documents as well as the possible role of waiver, estoppel, unclean hands and unjust enrichment.

Whatever may have been the precise relationship between the local church and the general church in the years after 1921, the local church's property rights might well, in the absence of express trusts, have been subordinated to the rights of the general church. We state this conclusion in tentative fashion, because there has been as yet no factual determination about what the provisions of the Book of Discipline were at the various times at which the various pieces of property were acquired. It is the role of the trial court, in the first instance, to ascertain and to interpret, in secular fashion, the property rules of the Methodist Church that govern the rights of the general church in property deeded to the local church. It may well be that the priority of interest of the general church so clearly articulated in the recent revisions of the Book of Discipline was not yet spelled out in earlier versions. The trial court will have to inquire into the appropriate ecclesiastical rules and regulations, including the Book of Discipline and other applicable Methodist documents to see whether they encompass the transactions under scrutiny. See *Jones* v. *Wolf,* supra,

604;[11] *Presbyterian Church* v. *Mary E. B. Hull Memorial Presbyterian Church,* supra, 449; *Carnes* v. *Smith,* 236 Ga. 30, 38–39, 222 S.E.2d 322, cert. denied, 429 U.S. 868, 97 S. Ct. 180, 50 L. Ed. 2d 148 (1976); cf. *Presbyterian Church* v. *Eastern Heights Church,* 225 Ga. 259, 260, 167 S.E.2d 658 (1969). It may well be that the applicable rules of the hierarchical church to which Round Hill was connected did not at all relevant times create a preference for the general church. If not, such property would remain with Round Hill despite its connection with the Methodist Church.

Finally, we must recognize that, whatever the terms of the rules and regulations and Book of Discipline of the Methodist Church, the trial court, on remand, may find that there was considerable ambiguity in the relationship between Round Hill and the Methodist Church in the years after 1921. This ambiguity was known to the Methodist Church through the knowledge of its ministers.[12] It is

---

[11] "The neutral principles method . . . requires a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church. In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust. In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body. *Serbian [Eastern] Orthodox Diocese* [v. *Milivojevich*], 426 U.S. [696,] 709, 96 S. Ct. [2372, 49 L. Ed. 2d 151 (1976)]." *Jones* v. *Wolf,* 443 U.S. 595, 604, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979).

[12] On this appeal, the plaintiffs do not dispute that the trial court correctly concluded that the ministers at Round Hill were agents of the Methodist Church.

reflected in the annual journals and other communications of the Methodist Church. The defendants contend that this known ambiguity, coupled with consistent representations by the local Methodist ministers that the church at Round Hill was a nondenominational community church, disable the plaintiffs from now laying claim to property acquired after 1921. This is the issue which is at the heart of the special defenses of estoppel, waiver, unjust enrichment and unclean hands. See, e.g., *Bozzi* v. *Bozzi*, 177 Conn. 232, 241–42, 413 A.2d 834 (1979); *DeCecco* v. *Beach*, 174 Conn. 29, 34–35, 381 A.2d 543 (1977); *Novella* v. *Hartford Accident & Indemnity Co.*, 163 Conn. 552, 561–65, 316 A.2d 394 (1972); *Providence Electric Co.* v. *Sutton Place, Inc.*, 161 Conn. 242, 246, 287 A.2d 379 (1971); *Jensen* v. *Nationwide Mutual Ins. Co.*, 158 Conn. 251, 261–62, 259 A.2d 598 (1969); *Collens* v. *New Canaan Water Co.*, 155 Conn. 477, 491–92, 234 A.2d 825 (1967); *Connecticut National Bank* v. *Chapman*, 153 Conn. 393, 399, 216 A.2d 814 (1966); *Jenkins* v. *Indemnity Ins. Co. of North America*, 152 Conn. 249, 257, 205 A.2d 780 (1964); *Spear-Newman, Inc.* v. *Modern Floor Corporation*, 149 Conn. 88, 91–92, 175 A.2d 565 (1961). If in fact property was given to the church at Round Hill in reasonable reliance on misleading representations or intentional nondisclosure concerning Round Hill's Methodist affiliation, then, as in cases of fraud or collusion; *Serbian Eastern Orthodox Diocese* v. *Milivojevich*, 426 U.S. 696, 721, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976); *Gonzalez* v. *Archbishop*, 280 U.S. 1, 16, 50 S. Ct. 5, 74 L. Ed. 131 (1929); the claim of the general church to the property in dispute may be defeated by its own failure to act according to secular standards of good faith.

We cannot adjudicate these claims on the present record. Estoppel, waiver, unjust enrichment and unclean hands are all defenses which depend upon questions of fact that must be determined, in the first instance, by the trial court. *Novella* v. *Hartford Accident & Indemnity Co.,* 163 Conn. 552, 566, 316 A.2d 394 (1972); cf. *Morris* v. *Costa,* 174 Conn. 592, 600, 392 A.2d 468 (1978); *Multiplastics, Inc.* v. *Arch Industries, Inc.,* 166 Conn. 280, 286, 348 A.2d 618 (1974); *Brauer* v. *Freccia,* 159 Conn. 289, 295, 268 A.2d 645 (1970). These issues, as well as the unresolved questions of trust and property law, require a remand.

There is error, the judgment is set aside and the case is remanded for further proceedings in accordance with this opinion.

In this opinion COTTER, C. J., and PARSKEY, J., concurred.

BOGDANSKI, J. (dissenting). The trial court acted properly and legally in concluding that on February 14, 1921, the Round Hill Methodist Episcopal Church of Greenwich ceased to exist and that the Round Hill Community Church was established in theory as a community church and, in fact, acted as a community church during its nearly sixty years of existence.

It is fundamental that conclusions reached by the trial court must stand unless they are inconsistent with the subordinate facts or involve the application of some erroneous rule of law. *Craig* v. *Dunleavy,* 154 Conn. 100, 105, 221 A.2d 855 (1966). Since the plaintiffs have not challenged the subordinate facts recited in the court's memorandum of decision, the question remains whether the court's

subordinate facts support its conclusion. An examination of the entire record reveals that the subordinate facts fully support the conclusion that the Round Hill congregation separated from the plaintiff church in February, 1921, and that the court's conclusion does not involve any erroneous rule of law.

It is also fundamental that this court's function is to review the case on the record established in the court below and that we cannot retry the facts or pass upon the credibility of the witnesses. *State* v. *Penland,* 174 Conn. 153, 158, 384 A.2d 356 (1978); *Johnson* v. *Flammia,* 169 Conn. 491, 497, 363 A.2d 1048 (1975).

The trier is the judge of the credibility of the witnesses and the weight and effect of their testimony. *Hally* v. *Hospital of St. Raphael,* 162 Conn. 352, 359, 294 A.2d 305 (1972); *Salvatore* v. *Milicki,* 163 Conn. 275, 278, 303 A.2d 734 (1972). The trier may disbelieve a witness as to a part of his testimony and accept it in other respects; *Birgel* v. *Heintz,* 163 Conn. 23, 30, 301 A.2d 249 (1972); and is privileged to adopt whatever testimony it reasonably believes to be credible. *Birgel* v. *Heintz,* supra, 29. A judgment will not be reversed unless an erroneous rule of law has been applied or a conclusion reached that is inconsistent with the subordinate facts or so illogical or unsound or violative of rules of reason as to be unwarranted in law. *Schnier* v. *Ives,* 162 Conn. 171, 177, 293 A.2d 1 (1972). Moreover, there is no rule of law that a party cannot prevail unless the evidence produced to establish his case is harmonious and consistent throughout. Indeed, if that were the rule, there could seldom be success in an attempt to prove an ultimate fact. While the incon-

sistencies may impair the weight of the evidence they do not as a matter of law destroy its probative force. The trier of fact is free to select from conflicting evidence that which it considers most reasonable. *Sharpe* v. *Brotzman,* 145 Cal. App. 2d 354, 360, 302 P.2d 668 (1956).

The courts have developed two general approaches to adjudicating church property disputes without encroaching upon matters protected by the first amendment. The first approach already noted in the majority opinion is associated with the decision of the United States Supreme Court in *Watson* v. *Jones,* 80 U.S. (13 Wall.) 679, 20 L. Ed. 666 (1871).

In addition to the *Watson* polity approach, civil courts have avoided first amendment difficulties by relying on neutral principles of property law to resolve church disputes. In *Clough* v. *Wilson,* 170 Conn. 548, 552, 368 A.2d 231 (1976), quoting in part *Polen* v. *Cox,* 259 Md. 25, 30, 267 A.2d 201 (1970), this court stated: "[t]he fact that the source of the controversy lies in disagreement as to religious doctrinal beliefs and practices is not determinative of whether a civil court has jurisdiction to decide church property disputes, many of which arise over doctrinal controversy. 'To so hold would too narrowly restrict the scope of the court's jurisdiction. The relevant inquiry must be whether the court can resolve the property dispute on the basis of neutral principles of law.' "

The first amendment does not dictate that a state must follow a particular method of resolving church property disputes, as long as the method adopted does not require the court to resolve an issue of religious doctrine. *Jones* v. *Wolf,* 443 U.S. 595, 99

S. Ct. 3020, 61 L. Ed. 2d 775 (1979). Under the neutral principles approach as applied in *Jones,* courts review the documents relevant to title to and the right to control of the disputed property in light of generally applicable principles of property and trust law. These documents include the deeds, the state statutes, the charter and bylaws of the local church, and the constitution and laws of the parent church. This approach allows the potential disputants to determine the result by the manner in which they structure their relationships.

In the present case, it was not necessary for the court to resolve a religious controversy to determine ownership of the property under the "neutral principles" approach. The court was required to determine the ownership of the property acquired before 1921 on the basis of adverse possession. This necessitated a determination of whether the Round Hill Church separated from the Methodist Church. Thus, the trial court based its decision on purely nonreligious grounds.

There is no dispute that originally located on part of the subject premises was a church known as the Round Hill Methodist Episcopal Church. This church had a hierarchical relationship with the Methodist Church. Since at least the turn of the century, Round Hill Methodist Episcopal Church came upon hard times. There was little support for this church and it may have been either closed or at least inactive during the period of 1907 to 1921. By 1921, it became apparent that a Methodist Church could not survive in the Round Hill section of Greenwich.

On February 14, 1921, eleven individuals met at the church, all of whom comprised the official board

of the Round Hill Methodist Episcopal Church (and who constituted most, if not all, of the active congregation), and decided to organize a community church. The minutes of that meeting provided in part the following: "A motion was made and seconded that the Round Hill Methodist Church be made a Community church. A committee to look after the By Laws of the Community church discussed, the move (sic) was made and seconded that Rev. H. Wilson, Mr. Huyler and Mr. Marshall be the committee. . . . It was voted that Rev. Wilson see Rev. Rogers, pastor of the North Greenwich Congregational church, and have a talk with him about joining their church with ours." The record reveals that the North Greenwich Congregational Church did in fact join the Round Hill Community Church.

From that moment on, the Round Hill Methodist Episcopal Church ceased to exist and the Round Hill Community Church was born as a nondenominational church to serve the community of Greenwich; it was established in theory as a community church and during its nearly sixty years of existence, Round Hill in fact acted as a community church. A community church has been defined as an "interdenominational or nondenominational church for community use . . . ." Webster, Third New International Dictionary. As a community church Round Hill prospered; its membership significantly increased. The court concluded that Round Hill Community's church polity, and that of its corporate successor Round Hill Community Church, Inc., has always been independent and congregational in form, and that it has never had a connection with the hierarchical polity of the Methodist Church.

In addition to the resolution of February 14, 1921, creating a community church, the court took into consideration matters which subsequently occurred to confirm the congregation's intent to establish an independent church. These include the following: Two years after the birth of Round Hill, a separate nonstock corporation, Round Hill Community Association, Inc., was organized to take title to real property held for Round Hill. This nonstock corporation was *not* organized as an ecclesiastical corporation and its articles of association made no reference to the Methodist Church, connection or trust; all the property to which Round Hill took title since its birth made no reference to the Methodist Church, connection or trust. In 1952 Round Hill incorporated as an ecclesiastical corporation under the general provisions and not under that part of the chapter of the General Statutes which had provisions for the Methodist Church, and its articles of association made no reference to the Methodist Church, connection or trust. In all of its temporal affairs, including its financial management and property transactions, Round Hill has always been completely independent.

While a delicate balance must be maintained during such an inquiry it appears from footnote nine of Justice Brennan's majority opinion in *Serbian Eastern Orthodox Diocese* v. *Milivojevich*, 426 U.S. 696, 715, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976), that a slightly more in-depth inquiry is permitted for the *sole purpose of confirming* the court's conclusion as to the church's polity. Accordingly, the following facts can be pointed out which confirm the polity of Round Hill as independent and congregational in form: By its name, by its written invitations to

prospective members, by its correspondence to its congregants, by all the physical evidence in and outside of the church sanctuary and other buildings, by its telephone and city directory listings, and by its listings in the newspaper's church directory, Round Hill has since its birth in 1921 represented to its members and the public that it was a nondenominational church. There was no tangible evidence that would lead either its members or the public to suspect the church was connected with the Methodist hierarchy; the ministers of Round Hill, who were also members of the plaintiff New York Annual Conference, consistently represented to the members of Round Hill and the public that it was a nondenominational community church; since 1921, Round Hill did not send lay delegates to the New York Annual Conference; Round Hill never received financial assistance from the Methodist Church. Although the bishops of the New York Annual Conference perfunctorily appointed the ministers for Round Hill, they were first selected by a committee of Round Hill and appointed by the trustees of Round Hill; the power of appointment of a minister was always exercised by the trustees of Round Hill up until the last appointment, which was made by the official board and congregation; assistant ministers were employed by Round Hill who were not Methodists; confirmation classes were never advised it was a Methodist Church; Round Hill adopted a statement of principles in 1958, amended in 1971 and 1977, that reveals that it was a "community, as distinct from a denominational" church; membership certificates issued prior to 1921 contained vows of faithfulness and obedience to the Methodist Episcopal Church but those issued after 1921 did not contain such vows.

The plaintiffs claim that none of the acts of Round Hill or its congregants during the nearly sixty years since the formation of this community church would have any effect upon its relationship with the Methodist Church until there is a formal withdrawal consented to by the plaintiffs.

This claim overlooks the fundamental fact that the congregation in 1921 clearly organized a new church to serve the community and not just the Methodist denomination. It is thus clear that with this finding Round Hill was and continues to be an independent church and the contract and implied trust theories by which the plaintiffs seek to gain control of the property must fail. See *Baldwin* v. *Mills,* 344 So. 2d 259, 265 (Fla. App. 1977).

The plaintiffs also contend that they cannot be bound by the actions of the congregation in 1921 or by any subsequent acts taken by Round Hill because they were never given notice. The fact of the matter is that the individuals that organized Round Hill in 1921 had no obligation to give the Methodist Church or any other denomination notice that it was organizing an independent church.

Nevertheless, the Methodist ministers of Round Hill were aware of all the significant acts taken by Round Hill from its inception in 1921 through the adoption of its revised statement of principles in 1977. These ministers were not only Methodists but they were also members of the plaintiff New York Annual Conference.

For purposes of constructive notice, these Methodist ministers were agents of the plaintiffs. Principals are presumed to have knowledge of the acts done by their agents when the agents act in rela-

tion to the subject matter of the agency within the scope of an actual or apparent authority conferred upon them. *Derby* v. *Conn. Light & Power Co.*, 167 Conn. 136, 142, 355 A.2d 244 (1974).

Lastly, the record reveals that the New York Annual Conference and the Bishop and his predecessors had actual knowledge of the organization of Round Hill as a nondenominational community church and the subsequent actions taken by it. The claim of lack of knowledge has no foundation in fact or law.

I would therefore find no error.

ARTHUR H. HEALEY, J. (dissenting). I concur in the dissenting opinion of Justice Bogdanski. I would, however, make certain other observations. I think that the majority has not observed the proper function of this court on review of the decision of the trial court. See Practice Book, 1978, § 3060D. We have recently stated: "On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. See Practice Book, 1978, § 3060D. This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in the light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's review of the

trial court. Beyond that, we will not go." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 34 (1980).

The majority does not refer to undisputed facts concerning events that took place after 1921 that, nonetheless, shed light on the intention and effect of the 1921 resolution. These facts, recited in Justice Bogdanski's dissenting opinion, are characterized by the majority as "conduct [that] deviated from the normal practices of more orthodox methodist churches." The majority concludes that any such deviation presents an "ecclesiastical matter to be adjudicated not by us but by the proper authorities within the hierarchical church." I believe that either a civil court has constitutional authority to decide, in order to settle title to real property, whether Round Hill separated from the Methodist Church or it does not. If it does, then *all* the facts as disclosed by the memorandum of decision and the undisputed facts; see *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra; which bear on that ultimate conclusion of fact should be considered. These facts, which reflect the intention and effect of the 1921 resolution, were therefore relevant in the trial court and should be considered by this court in deciding whether the subordinate facts found by the trial court support the trial court's ultimate conclusions. When all the facts are considered, it is evident to me that the trial court's decision is not "clearly erroneous."

Turning to the property claims themselves, as the majority points out, the issues relating to them are inextricably joined to and controlled by the decision relating to separation. Once the trial court's decision relating to separation is sustained or set aside,

the property claims are accordingly determined. Therefore, I also believe that the majority incorrectly concluded that the trial court erred with respect to the resolution of the property claims.

Finally, although it might be argued that the trial court could have reached the result reached by the majority, that is not the issue on appeal. "We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally and factually supported." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra, 222.

The trial court heard the witnesses and considered a plethora of documentary evidence. It prepared a thorough memorandum, forty-three pages in length. To set the trial court's decision aside, it must be "clearly erroneous"; Practice Book, 1978, § 3060D; and that test has not been met here. Therefore, I dissent.